Botsford, J.
At the heart of this case is a proposed new runway for Logan International Airport. In 1976, a permanent injunction was entered in an earlier case between many of these parties concerning another proposed runway at the airport, and the plaintiff Massachusetts Port Authority (Massport) brings this case to seek relief from that injunction. Massport claims that even if one assumes the 1976 injunction applies to the proposed new runway at all — an assumption Massport disputes — the underlying rationale and purpose for that injunction have now been satisfied and in any event, changed circumstances warrant relief from the injunction’s prohibitions. The defendant City of Boston (Boston) and the intervening parties — the cities of Chelsea (Chelsea) and Somerville (Somerville), the town ofWinthrop (Winthrop), and five individuals[3] disagree with each of these propositions, and claim no basis for lifting the injunction has been shown.[4] Boston and the intervening defendants have also filed counterclaims against Massport. Among other grounds, these counterclaims assert that Massport has not complied with the Massachusetts Environmental Policy Act (MEPA) G.L.c. 30, §§61-62H, in relation to its proposed new runway and the larger “Airside Improvements Planning Project” (Airside Project) of which the runway is a significant part.
The earlier procedural history of this case may be briefly stated. Following the entry of the various intervening defendants, Massport moved for judgment on the pleadings concerning two of the claims in its complaint, and also moved to dismiss most of the counterclaims that Boston and the intervening defendants had filed. The motion for judgment on the pleadings was denied,[5] and the motion to dismiss the counterclaims was allowed in part and denied in part.[6] Thereafter the parties conducted discovery, and the case was tried before me without a jury in late J anuary and early February 2003, with post-trial argument extending to June 2003.
The case has two distinct parts: Massport’s complaint, which focuses entirely on the 1976 injunction (referred to as “the injunction case”); and the counterclaims brought by Boston and the interveners, which primarily relate to Massport’s compliance with MEPA and related claims. This memorandum of decision concerns solely the injunction case; the counterclaims are dealt with in a separate memorandum of decision.
Set forth below are my findings of fact on the injunction claims, based on the evidence presented at trial, followed by a discussion of the legal issues raised. For the reasons stated there, I conclude the injunction should be modified.
Findings of Fact[7]
The 1974 Massport Runways Project, the Ensuing Litigation and the Injunctions[8]
In 1974, and today, Logan International Airport (Logan Airport, or Logan) has five operating Runways to accommodate the arrival and departure of all aircraft to and from the airport.[9] On May 17, 1974, Massport entered into a contract with the Perini Corporation for the construction at Logan of a new, 3830-foot Runway called “GA/STOL Runway 14-32"[10] with associated taxiways, lighting and marking, as well as extensions of Runways 9 and 4L (4 left) with associated taxiways, lighting and marking; certain other taxiway and service road improvements were also included. The entire construction project was known as the ’’Runways Project." Among the proposed restrictions for the new GA/STOL Runway portion of the Runways Project were that (a) no turbo jet or turbo fan jet powered aircraft would use the Runway; and (b) operations on it would be limited to take offs to, and landings from, the southeast. These restrictions were set out in a memorandum of understanding between Massport and the Massachusetts Executive Office of Transportation and Construction (EOTC). The agreement between Massport and its contractor Perini was that unless the approval of the Federal Aviation Administration (FAA) were obtained for the proposed Runway restrictions, Massport could terminate the contract without obligation.
Massport did not file an environmental impact report pursuant to G.L.c. 30, §62, of MEPA (§62),[11] before contracting with Perini, or before construction commenced on the Runways Project. Massport took the position that it was exempt from the requirement to comply with that section of MEPA by virtue of its own enabling act, and further because it had dredged and filled the Bird Island Flats in Boston harbor and had made certain plans in regard to the Runways Project before July 1, 1973, the date that §62 became effective.
On May 18, 1974, at the request of the EOTC, Massport submitted to the EOTC an environmental assessment form, although continuing to contest the applicability of §62 to Massport or to the Runways Project. In the environmental form, Massport determined that the Runways Project would not cause significant environmental damage, and therefore that no further environmental reports would be filed (the “negative assessment”).
*167 On May 21, 1974, the FAA indicated its consent to the Runway restrictions set out in Massport’s memorandum of understanding with the EOTC. Massport then gave Perini permission to proceed, and work on the Runways Project commenced on May 23, 1974. The next day, May 24, Boston filed a petition for declaratory relief in the Superior Court, seeking to enjoin further work on the Runways Project.
The Secretary of Environmental Affairs (the Secretary) rejected Massport’s negative assessment on July I, 1974, having determined that the Runways Project might cause damage to the environment so as to require the preparation of a final environmental impact report (EIR). On July 7, 1974, the Secretary and the Secretary of Transportation and Construction filed a complaint against Massport, seeking to enjoin further construction. After trial of Boston’s suit against Massport, the Secretaries’ case was consolidated with it and submitted to the court on the same record. (The two actions — the one initiated by Boston, and the second initiated by the Secretaries — are referred to hereafter as “the 1974 actions.”)
On August 26, 1974, a judge of this court (Mason, J.), ruled in the 1974 actions that §62 of MEPA applied to Massport, that the Runways Project had commenced after the effective date of §62, and that the Runways Project might cause damage to the environment such that full compliance with MEPA was required. The court entered a judgment containing a permanent injunction that barred Massport “from any further construction of the Runways Project at Logan until [Massport] has published a final environmental impact report and otherwise complied with the provisions of G.L.c. 30, §§61 and 62.” Massport appealed. In February 1975, the Supreme Judicial Court affirmed the Superior Court judgment. See Secretary of Environmental Affairs v. Massachusetts Port Auth’y, 366 Mass. 755 (1975).
While Massport’s appeal of the Superior Court judgment was pending, the Secretary determined in October 1974 that Massport’s draft EIR, submitted two months earlier, did not adequately and properly comply with §62 of MEPA. On April 30, 1975, Massport submitted a final EIR for the Runways Project to the Secretary. The Secretary determined that the final EIR failed to comply with MEPA on June 6, 1975.
Beginning in early 1975 and continuing into the spring of 1976, the parties to the 1974 actions (including the interveners in that litigation) discussed a possible resolution of their disputes about the Runways Project. Several concepts were considered, including the possibility of amending the Runways Project so that it would include construction of the runway extensions on Runways 9 and 4L solely for use as safety overruns, and would not include the GA/STOL Runway 14-32 at all. The parties reached a tentative settlement, and on March 29, 1976, in connection with that proposed settlement, the Massport board resolved to amend the Runways Project. In particular, the board voted to modify the project so as not to construct the GA/STOL 14-32 Runway, and to build Runways 4L and 9 only as extended safely areas rather than operational runway extensions.[12]
On June 22, 1976, the parties to the 1974 actions filed a joint motion to modify amended judgments in the two 1974 actions, together with agreed forms of “Further Amended Judgment.” The joint motion briefly summarized the history of the litigation, and continued:
. . . [T]he parties to this suit have been engaged in an intensive effort to review and evaluate the environmental impacts of the Runways Project, and alternatives to this project which would avoid or minimize said impacts but allow the Port Authority to achieve substantial benefits from the project as finally modified and completed. After lengthy discussion, the parties have agreed upon the level and type of additional construction necessary to complete the extended safety areas.
The parties believe at this time that this resolution minimizes damage to the environment, avoids the substantial controversy created by the original proposal, reflects a fair and adequate resolution of all issues presented in the suits, and satisfies the requirements of G.L.c. 30, §§61 and 62 and the applicable regulations thereunder. The resolution has the further advantage of allowing certain limited construction to proceed without further uncertainties as to future litigation and interruption of work . . .
This motion is not to be construed as a contract, and the parties recognize that the Court shall retain authority to modify or amend further the Further Amended Judgment as provided therein.[13]
The joint motion was allowed by Judge Mason on June 22, 1976. Further amended judgments entered in the 1974 actions on June 28, 1976, in the exact form proposed by the parties. Each judgment provides in relevant part as follows:
It is ORDERED and ADJUDGED:
The Massachusetts Port Authority and Perini Corporation are enjoined from any further construction of the Runways Project at Logan Airport, except that the work shown [on the plan and related documents attached to the judgment] maybe done to complete the Runway 4L and Runway 9 portions of the project as extended safely areas and not as Runway extensions. In determining to complete the project as described above, Massachusetts Port Authority has complied with the provisions of G.L.c. 30, §§61 and 62, and the applicable regulations issued thereunder.
As provided in Mass.R.Civ.P. 60(b)(5) and (6), this Court may modify or amend further this Further *168 Amended Judgment upon the motion of any party if it shall be no longer equitable that this Further Amended Judgment should have prospective application or for any other reason justifying relief from the operation of the Further Amended Judgment . . . This Further Amended Judgment is entered with the consent of all parties and supersedes in all respects the Judgment on Findings by the Court entered August 26, 1974, and the Amended Judgment entered on September 13, 1974, and corrected on October IS, 1974.[14]
(The further amended judgments are referred to hereafter in the singular, as “the 1976 injunction.”)
The 1995 Airside Improvements Planning Project, MERA and FAA Review
Massport began to develop the Airside Project in the early 1990s, principally based on (1) a study entitled Boston Logan International Airport Capacity Enhancement Plan that was published by the FAA in October 1992 (trial exhibit [ex.] 25), and (2) the Logan Airside Improvements Feasibility Study by Jason Cottrell and others, dated July 1995, which Massport had commissioned (ex. 27). The 1992 FAA study had focused on what the FAA perceived as a seriously growing problem of delay at Logan Airport, and had recommended the construction of a new, unidirectional runway located between the compass points of 140 degrees and 320 degrees (14/32) southeast-northwest in the southwest corner of Logan’s airfield.[15] The 1995 feasibility study evaluated the feasibility of a proposed 14/32 unidirectional runway and a number of other proposed changes including taxiway improvements and reducing approach minimums.
With respect to the Airside Project, in contrast to its initial position on the Runways Project in 1974, Massport agreed that it would be necessary to comply with MEPA and to file an environmental impact report (EIR). Accordingly, in July of 1995, Massport filed an environmental notification form with the Secretary pursuant to MEPA. At the same time, the FAA submitted to the Federal Environmental Protection Agency its notice of intent to prepare an environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §4321 et seq. The Secretary issued a certificate in November 1995 that defined the scope of the draft EIR that would be required to be filed under MEPA, and the FAA issued the scoping decision for the draft EIS necessary for NEPA compliance.
Massport submitted a combined draft EIS/EIR to the Secretary in February 1999. The draft EIS/EIR identified and discussed certain alternatives for increasing airfield efficiency and safety and reducing current and future levels of aircraft and passenger delay at Logan Airport, including the construction of a new Runway (Runway 14/32) at the same location as the GA/STOL Runway proposed twenty years earlier. An extended 60-day public comment period followed the filing of the draft EIS/EIR. In addition, during that period, the FAA held two public hearings on the draft EIS/EIR.
In connection with the MEPA and FAA review processes, Massport sought public participation and review. In November 1995, the Massport board established the Airside Review Committee (ARC), consisting of the Community Advisory Committee (CAC)— a group of twenty-four or twenty-five communities surrounding Logan — and eleven business and industry organizations. Massport also funded an independent technical consultant or consultants to work with the CAC itself and to provide assistance in evaluating the analysis and conclusions of the Airside Project plan. Between 1995 and 1999, the preparation period of the draft EIS/EIR, Massport and the FAA held sixteen meetings with the ARC; fifteen meetings with the CAC; and many meetings with the CAC’s technical consultants. Massport also made presentations to and met with many other community and business leaders.[16]
The Secretary issued a certificate on the draft EIR on May 7, 1999 for the Airside Project. The Secretary determined that the draft EIR complied with MEPA and its implementing regulations, and should proceed to a final EIR. In January 2000, responding to the draft EIS, the FAA requested Massport to prepare a supplemental draft EIS. The FAA also directed the formation of a new panel, called the SDEIS panel, to advise the FAA on the contents of the supplemental draft EIS. This panel was composed of three members appointed by the Mayor of Boston, and three members appointed by the Governor. Between March and December 2000, the SDEIS panel held twelve meetings and made informational visits to regional airports and the Logan Airport air traffic control tower.
Massport submitted a joint supplemental draft EIS/final EIR to the Secretary on March 23, 2001. This document discusses four different alternatives for improvements at Logan Airport. They are as follows:
Alternative 1, which includes (a) construction of a new unidirectional Runway 14/32, (b) construction of a new centerfield taxiway and three other taxiway changes, (c) reduction in approach mínimums on certain runways, and (d) implementation of a peak period pricing (PPP) program as a demand management tool;
Alternative 1A, which includes (a) though (c) immediately above, but does not include the PPP program;
Alternative 2, which includes (b) through (d) above, that is, all proposed improvements except Runway 14/32;
Alternative 3, the “no-build” alternative, including the reduced minimums and the PPP program only; and
*169 Alternative 4, the “no action” alternative, which would involve making no changes.
Massport proposed Alternative 1A — all proposed changes except implementing the PPP program — as the “preferred alternative.” There was a 75-day public comment period following this submission, and the FAA also held two public hearings.
On June 15, 2001, the Secretary issued a certificate for the Airside Project in which he determined that the final EIR “adequately and properly complies with [MEPA and its implementing regulations). This concludes the MEPA review of this project.” (Certificate of the Secretary of Environmental Affairs on the Final Environmental Impact Report [final certificate], ex. 33, p. 1.) The final certificate designated Alternative 1 — all proposed improvements, including the PPP program — as the operative alternative. The effect of the final certificate was to give the necessary MEPA approval of the various components of the Airside Project, including construction of the new Runway 14/32, but subject to Massport’s obligation to implement certain mitigation measures pursuant to §61 of MEPA. In particular, the Secretary directed that Massport commit itself to: putting into place an enforceable PPP program or an alternative demand management schedule with comparable effectiveness; begin working with the CAC to update the Preferential Runway Advisory System (PRAS), a set of goals for air traffic controllers to use in determining runway usage in order to achieve an equitable system for noise distribution among all the communities surrounding Logan; developing a program designed to maximize the use of single engine taxi procedures by airlines using Logan; making its Logan satellite parking lots and stations available for third-party bus and travel connections to other regional airports, including T.F. Green/Providence and Manchester, New Hampshire; making membership in the Logan Transportation Management Association (TMA) mandatory for all Logan employers as early as possible; and maintaining Runway 14/32 as a unidirectional runway.[17] On June 18, 2001, the Massport board voted to adopt “Section 61 Findings” for the Airside Project that included the findings required by the Secretary in his final certificate. (Ex. 51.)
On June 28, 2002, the final EIS was submitted to the FAA, and a 30-day comment period ensued. On August 2, 2002, the FAA issued its record of decision (ex. 48). Although it deferred approval of the centerfield taxiway proposal pending further study, the FAA otherwise approved the Airside Project subject to certain mitigation measures, including the unidirectional requirement for Runway 14/32, and that Runway 14/32 be used only when the prevailing winds are from the northwest or southeast, and are ten knots or greater.[18]
Delay
Delay in the context of Logan Airport and this case refers to aircraft delays in arrivals and departures from Logan, and the resulting delays for passengers. At the time the 1974 actions were litigated in 1974-76, it appears undisputed that Logan Airport was not experiencing any meaningful level of delay, or any significant upward trend in delay. Nonetheless, the 1980s saw increases in passenger traffic, as well as in flight operations (the number of aircraft take offs and landings), which are considered by the FAA to be “a more appropriate measure of demand on the airside of the field.” (Boston Logan International Airport Capacity Enhancement Plan, October 1992, ex. 25, p. 17.)[19]
The number of passengers at Logan Airport in 2000 was approximately 27.7 million, a record high, and there were in the neighborhood of488,000 to 510,000 flight operations.[20] In 2001, the number of passengers fell to approximately 24.5 million, and the airport had 463,125 operations; in 2002, preliminary data showed that the passenger numbers decreased again to 22.7 million, and the operations decreased to between approximately 392,000 and 394,000.[21] Massport views this reduction in delay as a consequence of September 11 and the downturn in the economy, and as temporary- — as one or more witnesses stated, a “blip” or “burp” in an otherwise linear progression upward. Indeed, all the witnesses — those testifying for Boston and the interveners as well as for Massport — opined that the decrease in airport demand observed in 2001 and 2002 reflected a temporary pause, and that airport demand would certainly increase in the future.[22] I accept this opinion of increasing future demand.[23]
These increases in operations have led to increases in delay. In 1998, according to Massport estimates— developed through a computer model by consultants retained in connection with the Airside Project — there were 142,000 hours of annual aircraft flight delay at Logan Airport.[24] Of this total, 120,000 hours were calculated by Massport to comprise runway-related delay: 51,000 hours during times of good weather, when visual flight rules (sometimes referred to as “VFR”) were in effect, and 69,000 hours during bad weather when instrument flight rules (sometimes referred to as “IFR”) were in effect.[25] For approximately ten years before 2000, Logan was consistently ranked among the top ten airports for delay. In 2000, the FAA ranked Logan Airport sixth in terms of total delays, and second in terms of arrival delays, even though Logan was ranked as the eleventh or twelfth busiest airport in the United States in terms of annual operations. In 2001, Logan was ranked sixth in arrival delay and within the top fifteen airports for total delay. However, at least at the time of trial in Januaty 2003, Logan’s delay rating may have substantially improved: the preliminary FAA national ranking of Logan Airport for 2002 in terms of total delays was twenty-second. At the same time, the positive correlation between *170 increases in the number of passengers and flight operations on the one hand, and increases in delay on the other, which are clearly reflected in the numbers discussed above, suggests that the apparent decrease in Logan’s delay ranking for 2002 is related to the temporary decrease in demand seen in the last two years, and that as demand increases in the future, delay will follow suit.
Delay at Logan Airport is caused by several major factors: (1) bad weather; (2) airline overscheduling (and increased operations); and (3) moderate to strong northwest wind configurations. With respect to bad weather, the critical point is that when weather conditions such as snow, rain, sleet fog, etc., reduce visibility below a defined threshold, all aircraft are required to use an instrument approach in order to land — that is, the instrument flight rules (IFR) are in effect — and this causes delay because, among other reasons, separations between departing or landing aircraft must be increased, and Logan does not have parallel runways that allow for simultaneous IFR approaches. In addition, not all the runways are equipped with instrument landing systems. It is the case that when IFR are in effect, often only one runway may be used for arrivals. At the present time, there is not much that can be accomplished to reduce delay caused by the need to use instrument flight rules.
Airline overscheduling refers to the circumstance when scheduled operations for an airport exceed its operational capacity; in the case of Logan, Massport and the FAA define maximum practical operational capacity as 120 operations per hour. There are certain periods of the day in which there is a peak demand— for example, between 7:00 a.m. and 8:00 a.m. and between 4:00 p.m. and 6:00 p.m. — and certain times of year where demand peaks as well — e.g., holidays, school vacations and the summer, especially August. Although there has been at least one year (1993) when Logan experienced periods of noticeable airline over-scheduling in August, the problem of overscheduling had been reduced by 2000, and was reduced further as of 2002. If one assumes that 120 operations per hour represents the optimum practical capacity for Logan, delays caused by actual airline overscheduling do not appear to be a real problem at the present time.[26] Nevertheless, it is the case that as a general matter, increases in flight operations increase delay, particularly as the number of operations approaches the airport’s capacity; expressed mathematically, there is an exponential relationship between increases in demand as a percentage of capacity and the amount of delay. (See ex. 27, figure 1-5.)
Northwest winds are the third major cause of delay at Logan Airport. For Logan to operate at a maximum capacity of 120 operations per hour, there needs to be three runways available for use, preferably two for arrivals (which take more time than departures) and one for departures. When winds are calm from any direction and the weather is good, one or more three-runway configurations are available. However, aircraft must take off and land heading into the wind, and when winds are blowing out of the northwest at a moderate speed, the directional orientation and configuration of the runways at Logan Airport are such that generally only two runways can be used: Runways 33L and 27, with 33L being used for all arrivals and 27 becoming the primary departure runway.[27] In moderate northwest winds, the operational capacity of Logan drops from a maximum of 120 operations per hour to approximately 90 operations per hour.[28] This reduction causes delay. When northwest winds are strong, the cross winds are such that Runway 27 can no longer be used, and essentially the only available runway is 33L,[29] which must be used for both arrivals and departures. At these times, Logan’s capacity drops to approximately 60 operations per hour, and delays increase.
On average, the prevailing wind is from the northwest 37 percent of the year, a percentage that includes calm as well as moderate and strong northwest winds.[30] And generally, when winds are from the northwest, the sky is clear and the weather sunny — in other words, visual flight rules rather than instrument flight rules are in place. Thus, it is the wind direction and velocity, rather than low visibility or other incidents of bad weather (e.g., snow on the runway), that cause the reduction in available runway configurations.
Proposed Runway 14/32
The proposed new Runway 14/32 would be located in the southwest portion of the Logan Airport airfield at the 14/32 (140 degrees-320 degrees) compass coordinates. It would be 5000 feet in length with 1000 feet runway safety areas at each end. The proposal is for the runway to be unidirectional, that is, all departing planes would take off to the southeast and all arrivals would come from the southeast.[31]
Runway 14/32 is proposed to be constructed in the same location as the earlier GA/STOL Runway that was part of the 1974 Runways Project, has exactly the same directional orientation and compass coordinates, and is advanced for the same purpose, namely, to deal with delay associated with northwest winds at Logan Airport. The only difference between the two proposed runways is length: the GA/STOL Runway was to be 3830 feet, and Runway 14/32 is to be 5000 feet
The reason Runway 14/32 is projected to reduce northwest wind-related delay is that it would provide an additional runway for arrivals and departures under northwest wind conditions. As noted above, when moderate northwest winds are blowing, only two runways are currently available, Runways 33L and 27. Given its compass orientation, Runway 14/32 would offer a third runway in these wind conditions, giving Logan its optimum three-runway configuration for *171 arrivals and departures. In strong northwest winds, when only Runway 33L is available, Runway 14/32 would offer a second runway. It is true that the 5000-foot length of Runway 14/32 is not long enough for the largest planes to use. However, I am persuaded by the evidence that most regional jets flying into Logan could and would use this runway.[32] Regional jets generally have a capacity of under 100 passengers, and their use is rapidly increasing at Logan. They represented twenty percent of the aircraft mix in 2001, up from ten percent in 2000, and it is estimated that the relative percentage of regional jets in the Logan traffic mix will continue to rise. (See ex. 47, appendix J, p. 2.)
As part of the delay modeling work it did in preparing the draft and final EIRs for the MEPA review process and the draft, supplemental draft and final EIS for the FAA/NEPA review process, Massport developed computer models of projected hours of runway-related delay reduction resulting from the use of Runway 14/32 in moderate or strong northwest winds. These models indicate that if Runway 14/32 had been in operation in 1998, the overall runway-related delay would have been reduced by an estimated 32 percent, and the runway-related delay occurring in VFR conditions would have been reduced by an estimated 87 to 90 percent.[33] I accept this evidence as an estimate, not a precise calculation of benefit.[34]
The evidence concerning future projections of delay reduction effects to be derived from Runway 14/32 is more nebulous, at least as one travels farther into the future. Massport projects that it will reach the level of 29 million passengers by 2008, generating an estimated delay of 204,000 annual hours; it further projects that Runway 14/32 would eliminate 54,000 hours of this delay — from 204,000 hours to 150,000 hours — representing a 27 percent reduction, if one assumes an aircraft mix that includes a high number of regional jets.[35] Massport also estimates that at the point it reaches a level of 37.5 million passengers (projected to occur around 2018), Logan Airport would generate 372,000 hours of annual delay if none of the Airside Project improvements were implemented, and that the addition of Runway 14/32 would cut this delay total to 263,000 hours or 29 percent. However, a May 2002 evaluation that the FAA requested the MITRE Corporation to conduct of the Massport estimates of delay suggests persuasively that annual hours of delay would never be permitted to increase to a projected level anywhere near 372,000, because it would be simply unacceptable: the FAA, Massport or the airlines would have taken some action before then, in the form of a demand management program or otherwise, to reduce the delay. (See ex. 47, appendix J.[36]) And if the annual delay were not this high, the savings generated by Runway 14/32 would not be as high as projected.[37] Nonetheless, MITRE concluded that while “the magnitude of the delay savings attributable to the new Runway may be overstated, . . . the savings are still substantial under almost any reasonable long-term traffic forecast.” (Id.)
Proposed Runway 14/32 creates concerns about increased noise for Logan Airport’s neighboring communities and their residents. At the trial eloquent testimony was presented by witnesses from East Boston (Maiy Ellen Welch), Winthrop (John Vitagliano), and Chelsea (Edward Keefe) about the effects of persistent noise from aircraft with flight tracks over or near these communities. Nonetheless, Runway 14/32 itself would actually appear to reduce the exposure of persons living in communities closest to Logan Airport with respect to the highest levels of noise, at or above the 75 dB (decibel) DNL (day-night average sound level) noise contour, and also the next highest noise contour, 70 dB DNL and above. On the other hand, it seems that the runway would result in a greater number of people being exposed to the lower 65 dB DNL and particularly the 60 dB DNL noise contours. The final EIR and the Secretary’s final certificate suggest that this is especially true in the community of Chelsea, but also in certain sections of East Boston and South Boston. (See final EIR, ex. 30, Tables 6.2-20, 6.2-22; final certificate, ex. 33, Attachment A.)[38] However, the northwest/southeast ten-knot wind restriction imposed by the FAA on Runway 14/32 appears to reduce these impacts. And the proposed runway, if combined with a PPP program as it is required to be, seems to offer distinct benefits over the “no action” alternative in terms of providing greater flexibility for air traffic controllers to assign runways in ways that distribute more equitably the adverse noise impacts on surrounding communities.
As for air quality, in the context of the MEPA review process, Massport has committed itself to an air quality initiative (AQI) in which it has agreed to set a cap for Logan Airport on net smog precursors (NOx and VOCs) that is pegged to be at or below the levels of these substances in 1999, regardless of future increases in operations or passengers.[39] If this commitment is honored, construction of Runway 14/32 would not result in an increase of NOx emissions at Logan. (See final certificate, ex. 33, attachment A.)
Demand Management and Other Alternative Measures to Deal with Delay at Logan Airport
A demand management program such as PPP — a program that would impose higher landing fees or a surcharge on aircraft landing during peak demand hours at Logan — has the capacity to reduce delay by reducing, through higher prices, the number of operations during peak hours. As a consequence of the MEPA and FAA/NEPA review processes, Massport is required to develop a detailed plan for a PPP program (or a comparable demand management program) before beginning construction on Runway 14/32, and is further obligated to implement that plan now, rather than at some unidentified time in the future.[40]
*172 L.G. Hanscom Field (Hanscom), located approximately twenty miles from Boston in Bedford, Concord, Lincoln, and Lexington, Massachusetts, is another airport owned by Massport. Hanscom has the second-largest number of operations in New England, although a large number of these are “touch-and-go” operations associated with flight schools, that is, repeated take offs and landings by a flight student in order to learn how to perform these maneuvers. Hanscom is used primarily for general aviation — that is, non-commercial flights, including corporate jet flights. In 2000, there were over 200,000 general aviation (GA) operations at Hanscom (see Boston ex. 2), an increase over each of the preceding years. Logan’s own GA operations in 2000 totaled only 33,921, which was 6.65 percent of its total operations for the year. From the mid-1970s to 2000, although the amount of GA has remained relatively constant at Logan, the percentage of Logan’s total operations represented by GA has decreased substantially, from about 12 to 16 percent to between 5 and 7 percent. I infer that this change in relative share is due in significant part to the availability of Hanscom.
According to Massport, the GA operations at Logan are spread out throughout the day; they do not bunch in peak periods. Assuming Massport would have the authority to direct all GA traffic currently using Logan to Hanscom at least during peak hours, I am not able to determine what measure of impact this would have on delay at Logan.
There are also some commercial flight operations at Hanscom, although many fewer than GA operations. Massport limits Hanscom to 48 commercial operations per day, and imposes a 60-seat limitation on all aircraft using the airport. These restrictions obviously constrain the availability of Hanscom for large-scale commercial airline use. Massport is proposing to increase the commercial operations at Hanscom by approximately five times, which it estimates would still represent less than two percent of Logan’s annual operations. Massport has never undertaken an analysis of what impact a materially larger increase in commercial activity (e.g., twenty-five times) would have on the problem of delay at Logan. If Hanscom were to grow in this manner, it would require a major and lengthy building project at Hanscom in terms of new or expanded terminals, ticket counters, gates, parking and other passenger accommodations at the airport. Furthermore, the use of Hanscom as an alternative commercial aircraft destination is influenced by the decisions of commercial airlines about whether or not to fly there. Various witnesses opined about whether commercial carriers would or would not be likely to seek routes using Hanscom.[41] Their opinions are too speculative to permit a reasonable determination of what commercial carriers will or would decide to do with respect to increasing service to Hanscom. What the evidence does show is that the power to decide lies in large part with the carriers, not with Massport.[42]
Massport, whether on account of the insistence of the FAA or for other reasons, participates in efforts to increase the use of other regional airports and other means of transportation (principally the Acela high speed train) to help meet travel demand in the New England region. According to the FAA record of decision, during the 1990s, theT.F. Green/Providence and Manchester airports became the fastest growing airports in the country, while Logan’s rate of growth during that period declined to a level below the national average. Since 1996, eight out of ten new air passengers in New England use regional airports rather than Logan; the pattern up to that point had been that eight out of ten new passengers in New England used Logan. T.F. Green/Providence and Manchester are used increasingly by travelers for short-haul (flights of fewer than 750 miles) and medium-haul (flights between 750 and 1499 miles) trips. Logan remains the airport in the region that services almost all long-haul (1500 miles and above) flights.
DISCUSSION
Massport’s complaint in this case raises three separate claims to support its position that the 1976 injunction must be vacated: (1) Massport has fully complied with the injunction (Count I); (2) changed circumstances warrant relief from the injunction pursuant to Mass.R.Civ.P. 60(b)(5) (Count II); and (3) the injunction does not apply to Runway 14/32 in any event (Count III).
1. Application of the 1976 Injunction to the Airside Project
I address the third claim first. The 1976 injunction barred Massport “from any further construction of the Runways Project at Logan Airport, except . . . [for completion of certain work on Runways 4L and 9] as extended safety areas and not as Runway extensions.” Accordingly, construction of the GA/STOL Runway was part of the Runways Project construction that was enjoined. As the findings above indicate, the GA/STOL Runway and Runway 14/32 are proposed for the same location on the airfield at Logan Airport, and they have the identical directional orientation. They both are intended to be unidirectional, to be used solely for aircraft departures and arrivals to and from the southeast respectively. Finally, the primary purpose of the two runways is the same or essentially the same, that is, to alleviate delays caused by prevailing northwest winds that, when moderate or strong, reduce Logan Airport’s available runway configurations to two or even one runway. In terms of location, physical attributes and purpose, therefore, there is no substantial difference between the two runways.
The history of the Runways Project following the Superior Court’s original 1974 injunction supports this view. The original injunction prohibited Massport *173 from continuing construction on the Runways Project until it had filed a final EIR and otherwise complied with MEPA. The superseding 1976 injunction, however, in substance and effect imposed a permanent bar against construction of the proposed runway at the 14/32 coordinates in the southwest corner of the Logan airfield, subject to modification under Rule 60(b)(5) and (6). Boston argues persuasively that the addition of the express provisions for future modification of the injunction if circumstances warranted — a provision added at Massport’s insistence — would make little sense if the injunction was not intended not to apply to any future runway at the 14/32 coordinates. The FAA has historically considered the injunction to apply to a 14/32 Runway (see ex. 25, pp. 8, 9); the Secretary also takes this position in the present case.
Considered in this context, a determination that proposed Runway 14/32 does not fit within the scope of the 1976 injunction would fly in the face of geographical, historical and practical reality. I conclude that the 1976 injunction applies to Runway 14/32.
2. Relief under Mass.R.Civ.P. 60(b)(5)[43]
a. Introduction
Massport’s principal argument is that it is entitled to relief under Mass.R.Civ.P. 60(b)(5) or (6), from the continuing effect of the 1976 injunction.[44] The rule provides in relevant part as follows:
. . . On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. . .
Mass.R.Civ.P. 60(b)(5), (6) (emphasis supplied).
Massport unquestionably has the burden of proving its right to the relief sought under Rule 60(b). There is a question, however, concerning the standard that governs the determination whether it has met the burden. No appellate decisions in Massachusetts appear to provide the answer.[45] Federal cases construing the identical Fed.R.Civ.P. 60(b)(5) in the context of consent decrees, however, provide guidance.[46] Historically, the Federal courts had applied a strict standard in considering a request for relief from a consent decree under Rule 60(b) (5), following the lead of United States v. Swift & Co., 286 U.S. 106 (1932). See Id. at 119 (“Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned”). More recently, however, the Supreme Court has adopted a more flexible standard, rejecting the Swift approach as too rigid, at least in cases involving issues of institutional reform, but at the same time stressing that relief from a consent decree involving constitutional rights is not to be lightly granted. See Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992):
Although we hold that a district court should exercise flexibility in considering requests for modification of an institutional reform consent decree, it does not follow that a modification will be warranted in all circumstances. Rule 60(b)(5) provides that a party may obtain relief from a court order when “it is no longer equitable that the judgment should have prospective applications,” not when it is no longer convenient to live with the terms of a consent decree. Accordingly, a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree . . .
A party seeking modification of a consent decree may meet its initial burden by showing either a significant change either in factual conditions or in law . . . Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous . . . Modification is also appropriate when a decree proves to be unworkable because of unforeseen obstacles . . .; or when enforcement of the decree without modification would be detrimental to the public interest. . .
Once a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court should determine whether the proposed modification is suitably tailored to the changed circumstance . . .
Id. at 383-84, 391 (citations omitted). See id. at 383 n.7. Since Rufo, lower Federal courts have not confined the teaching of that case to cases involving institutional reform but have applied it more broadly. See, e.g., Bellevue Manor Assocs. v. United States, 165 F.3d 1249, 1255-57 and n.5 (9th Cir. 1999). See also Alexis Lichine & Cie. v. Sacha A. Lichine Estate Selections, Ltd., 45 F.3d 582, 586 (1st Cir. 1995) (considering application of Ru fo in context of private commercial dispute).
This is not a case involving issues of institutional reform and constitutional rights like Rufo and cases cited in the Rufo decision, but it is one that deals with the present and future operation of an important public facility, and with an indisputably broad array of public interests, including the interest of the traveling public in an efficient and safe airport and air transportation network, and the interest of those who live in the different communities surrounding Logan Airport in protection from noise, smog, and other environmental burdens associated with the airport’s operation. Furthermore, the parties to the 1976 injunction and amended judgment specifically agreed *174 that the judgment was not a contract, and the injunction included within it was subject to modification when equity required. A flexible standard such as that articulated in Rufo is appropriate to apply in this case.
a. Changed Circumstances
The first question, then, is whether Massport has demonstrated a significant change in law or one in fact that makes continued compliance with the 1976 injunction substantially more burdensome. The answer is yes. As the facts above indicate, in 1976, Massport did not have any problem with delay to speak of, but by 1990 and for the next ten years, it was consistently ranked within the ten most delayed airports in the United States. It is true that in 2001, there was less delay at Logan Airport — its ranking for hours of delay was within the fifteen most delayed airports, not ten— and in 2002, it appears that the delay decreased again quite significantly. But it is also the case that the numbers of passengers and operations in 2001 and 2QQÍ- were also progressively lower than in the previous three years, and the evidence indicated that an increase in passengers and operations are likely in the reasonably near future (as early as 2003 according to the FAA’s record of decision). As a number of witnesses stated, increases in passengers and operations by definition lead to more delay. Looking forward, delay thus remains a significant issue for Logan.
Boston argues that Massport’s claims of new and inordinate levels of delay derive from the premise that Logan’s optimum or appropriate maximum capacity is 120 operations per hour. Boston suggests that the airport’s maximum capacity should be deemed to be closer to the actual capacity level at which it currently has been operating most of the time, identified as around 104 operations per hour. (Boston refers to Figure 1-8 on p. 1-9 of the Logan 1995 feasibility study, ex. 27.) The argument is that if this lower operational capacity were designated as the maximum, Logan would be operating “at capacity” approximately 80 percent of the time and the impact of northwest winds on the concept of delay associated with not being able to operate at capacity would be far less.
The trouble with this contention is that the FAA, as the Federal agency charged with regulatory responsibility over the flight operations of Logan Airport (see, e.g., New England Legal Foundation v. Massachusetts Port Auth’y, 883 F.2d 157, 172 (1st Cir. 1989)), and Massport, charged by its enabling act (St. 1956, c. 465) with responsibility for Logan’s operations, have determined that 120 operations per hour is the appropriate maximum capacity of the airport. There is no basis in the record presented here for the court essentially to supplant that judgment. Cf. Boston Edison Co. v. Boston Redev. Auth’y, 374 Mass. 37, 70 (1977) (court will not substitute its view for agency determination, when supported by substantial evidence). Cf. also Massachusetts Fed’n of Teachers, AFT, AFL-CIO v. Board of Educ., 436 Mass. 763, 772 (2002) (court does not substitute its judgment for agency regulation).[47]
Winthrop argues that delay cannot be considered an appropriate changed circumstance because delay was or should have been foreseen at the time Massport agreed to the 1976 injunction. I disagree. As the findings above reflect, even if (1) an increase in demand overtime were foreseen in 1976 by most observers and should have been foreseen by Massport; and (2) Massport should reasonably have anticipated both that deregulation was coming to the airline industry and that deregulation would materially increase demand even more, the size and nature of the demand increase that would arise following deregulation — e.g., for Logan, an increase in regional and commuter traffic that generally meant smaller planes — was not foreseen. More importantly, it is now 2003; the injunction was entered in 1976. Not even Nostradamus could be expected to envision what air traffic demand would look like this far in the future. Massport, as a public agency, cannot be held responsible after this extended period of time for the vision of the future that earlier officials at the agency brought to bear on the issues of demand and delay. See Rufo, supra, 502 U.S. at 385 (rejecting as too rigid a standard that would allow for modification only when a change in facts is unforeseen and unforeseeable; “(l)itigants are not required to anticipate every exigency that could conceivably arise during the life of a consent decree”).[48]
b. “Suitably Tailored” Solution
The more difficult question in this case is the second Rufo condition, whether Massport’s proffered solution to the increase in delay, the proposed runway, “is suitably tailored to the changed circumstance.” Rufo, 502 U.S. at 391. Runway 14/32 is intended to affect the category of delay represented by northwest winds. The delay modeling performed by Massport consultants for the MEPA review process was explained at trial through the testimony of William Hoffman.[49] The delay modeling analysis estimates that if Runway 14/32 had been available in 1998, it would have provided approximately an 87-90 percent reduction in the VFR northwest wind-related delay, and about 32 percent of the total delay; and if one moves forward to 2010 and a projected total passenger level of 29,000, the total delay reduction estimated to be provided by the runway would come to approximately 27 percent. These calculations certainly have a speculative quality. But even if one declines to accept the precise percentages of delay savings being proffered, Runway 14/32 clearly would offer a direct means of reducing an appreciable amount of capacity-related delay at Logan that is caused by northwest winds.
There is no question that the proposed runway does not fully solve the issue of delay for Massport, or even half of it. It is also the case, using Massport’s projections, that even in the relatively near term the runway would leave Massport with substantially more than *175 the 20,000 hours of annual delay that the FAA takes as a signal of a congested airport. Nevertheless, Runway 14/32 does deal quite definitively with the particular type of delay attributable to northwest winds in fair conditions. With an airport such as Logan, where the prevailing winds are from the northwest 37 percent of the time, the runway thus offers a focused solution to a discrete but important portion of the delay problem.
Boston and the interveners contend that the runway cannot be seen as “suitably tailored” {Rufo, 502 U.S. at 391) when, using Massport’s 1998 delay modeling estimates of 120,000 hours of annual runway-related delay, the Runway 14/32 solution would deal with approximately 30,000 hours, but leaves 90,000 hours, in Boston’s words, “on the table.” The argument can be summarized as follows: many factors in addition to northwest winds are behind the delay problem at Logan; Massport has simply chosen to deal with the one factor; other means are available — primarily related to reducing demand — that would be more effective in combating the delay problem and, more importantly, would not require dismantling the protections of the 1976 injunction; but Massport refuses to pursue these other means, wrongly claiming that its hands are tied. In the view of Boston and the interveners, Massport’s chosen course of action does not entitle it to claim equitable relief from the 1976 injunction.
There are difficulties with this argument. First, of the 90,000 theoretical hours of delay that Boston claims Massport is ignoring, the estimate is that 69,000 of them are in IFR conditions. No one appears to disagree that when bad weather requires instrument flight rules to apply, the resulting slow-down of flight arrivals and departures is not an occurrence that Massport currently has much, if any, ability to address. Thus it cannot be said that Massport is simply choosing to ignore and not deal with this quantity of estimated annual delay.
Second, the solutions that Boston and the interveners propose focus primarily on reducing demand at Logan by directing GA operations to Hanscom Field, or greatly increasing commercial operations at Hanscom, or both. The record of this case does contain support for their argument that the approach of the FAA to issues of airport congestion and delay is evolving, and that particularly as a proprietor of more than one airport, Massport may well have more authority than it acknowledges here to take steps toward directing GA operations from Logan to Hanscom at least during peak congestion periods, thereby reducing demand and associated delay at Logan.[50] But even if Massport could do more than it has done to pursue diversion of GA traffic or to encourage the use of Hanscom as a commercial airport, taking those steps will not solve the entire delay problem either. The problems associated with weather-related delay, and the delays associated with moderate and strong northwest winds in particular, would remain. Moreover, there are significant uncertainties about the effectiveness of the demand reduction approaches being suggested. In the past, when considering an actual plan for diversion of GA operations from Logan to Hanscom, the FAA was less than supportive. See New England Legal Foundation v. Massachusetts Port Auth’y, 883 F.2d 157, 163 (1st Cir. 1989) (administrative law judge hearing complaint filed with FAA against new Massport landing fee structure for Logan concluded, inter alia, that Hanscom could not be used appropriately as an alternative to Logan for GA and/or commuter airlines primarily because Hanscom did not have the opportunities for connecting flights available at Logan). See also 49 U.S.C. §47101 (a)(9) (“It is the policy of the United States ... (9) that artificial restrictions on airport capacity — (A) are not in the public interest; (B) should be imposed to alleviate air traffic delays only after other reasonably available and less burdensome alternatives have been tried; and (C) should not discriminate unjustly between categories and classes of aircraft”). While objections articulated in the past may not be raised if the plan were one designed to affect GA operations only when traffic in peak hours demanded it, this itself would be a fairly restricted remedy that does not touch delay unrelated to congestion.[51]
Furthermore, it is not appropriate to view Runway 14/32 in a vacuum, which seems to be the position taken by Boston and the interveners in their point about Massport’s failure to deal with all the Logan delay. Massport has participated in the successful regional efforts to increase the use of regional airports other than Logan as one strategy to deal with increased demand and corresponding increases in delay at Logan. Massport (as required by the Secretaiy) has also committed itself in its §61 findings under MEPA to implement a demand management system that will be designed to reduce delays arising when the airport is scheduled near, at or over capacity. Proposed Runway 14/32 provides an additional tool to alleviate delay that is certainly different than the other two, focused as it is on capacity rather than demand. The three strategies, however, are appropriately considered together because, as demonstrated by the final MEPA certificate of the Secretaiy and the FAA record of decision, they are intended to work in a complementary way.
c. Summaiy: Equitable Considerations
Rule 60(b)(5), as it pertains to the 1976 injunction, asks whether continued prospective operation of the injunction “is no longer equitable” in the particular circumstances presented. The circumstances here include: (1) an injunction that has been in effect for 271/2 years against construction of a runway at a large public airport, a very long stretch of time in which passenger and operations levels at Logan have grown *176 dramatically with no new runways being added to the airfield;[52] (2) a major increase in delay at Logan Airport since 1976, the level of which was not foreseen at the time the 1976 injunction was issued; and (3) the fact that the 1976 injunction grew out of Massport’s non-compliance with MEPA in relation to an earlier version of the Runway proposed for this location, and Massport has complied with MEPA’s requirements with respect to proposed Runway 14/32.[53] While Runway 14/32 will not fully resolve the problem of delay, it is a solution tailored to deal with a persistent issue that causes delay, and deals with it effectively.
The circumstances of the case also include the environmental concerns of the communities surrounding Logan Airport. Logan has a profound effect on the people who live and work in these communities, particularly in terms of noise. But the evidence indicates that Logan’s negative force derives far more from the operation of Logan as a whole than from the proposed operations of proposed Runway 14/32, which is expected to reduce the noise impacts of flights at the highest noise level contours. If one could go back in time, one might well decide that the burden on the residents of Boston and the intervener communities is too great to justify the location of Logan so close to the center of this densely populated metropolitan area. But that is not the issue presented. The ten-knot northwest-southeast wind restriction imposed by the FAA limits the use of Runway 14/32 quite substantially; at this point, the negative environmental consequences of Runway 14/32 appear to be relatively contained. Furthermore, it appears that Massport will be required to implement mitigation measures to deal with these consequences through, for example, the residential soundproofing program and revision of the PRAS goals.[54]
Logan Airport remains the principal commercial airport in New England, connecting the region to the national and international air transportation system. It is a public facility, operated by a public authority. Massport has established that continuing the injunction’s bar against the construction of a unidirectional Runway 14/32 is no longer equitable.
3. Conclusion
The remaining question is whether the 1976 injunction should be vacated or modified. Massport asserts that vacating the injunction is the only appropriate result; the Secretary argues for modification. I agree with the Secretary that modification is appropriate.
The 1976 injunction barred construction of the Runway then being proposed, and also stated that the Runways Project as modified by the injunction complied with both §§61 and 62 of MEPA. This specific mention of compliance with MEPA serves to articulate in the injunction a continuing concern that Massport satisfy both the substantive (§61) and procedural (now §§62-62H) requirements of MEPA. Under Rule 60(b)(5), any modification is to be “suitably tailored to the changed circumstance.” Rufo, 502 U.S. at 391. In light of the discussion above, it is appropriate to modify the 1976 injunction by removing the flat prohibition against construction of Runway 14/32. However, as the Secretary points out, it is too soon to tell whether Massport will comply fully with MEPA’s requirements in terms of implementation of the §61 commitments. The modification should therefore be one that retains the court’s jurisdiction until full compliance with MEPA is shown.
One final point. Pursuant to the requirements of the Secretary and the FAA, Runway 14/32 will be unidirectional, and it will only be used when northwest or southeast winds are ten knots or stronger, except in emergency conditions. In addition, as Massport has presented it, Runway 14/32 is intended to deal only with delay created by adverse wind conditions, and not to enhance the capacity of Logan Airport. Presumably Boston and the interveners are very concerned about this last issue; one may imagine they see Runway 14/32 as a Trojan horse or, to use a more modern reference, “if you build it they will come.” (Ray Kinsella, Shoeless Joe.)[55] The point is that Massport’s representations about the purpose of the runway and the restrictions that have been imposed through the environmental review process must be taken into account in relation to the 1976 injunction. They form an essential part of the basis for my determination under Rule 60(b)(5) that a continued ban on construction of the new runway would be inequitable. Therefore, the modification of the injunction that will be ordered must reflect these restrictions.
ORDER
For the foregoing reasons, it is ordered that pursuant to Mass.R.Civ.P. 60(b)(5), the Further Amended Judgments entered on June 28, 1976, in City of Boston etal. v. Massachusetts Port Authority et al, Civil Action No. 99492, and in Secretary of Environmental Affairs etal. v. Massachusetts Port Authority etal., Civil Action No. 521, respectively, be modified to permit the Massachusetts Port Authority to construct and operate Runway 14/32 in accordance with (1) the Certificate of the Secretary of Environmental Affairs on the Final Environmental Impact Report in EOEA #10458, dated June 15, 2001; and (2) the Record of Decision of the Federal Aviation Administration on the Airside Improvements Planning Project, dated August 2, 2002.
Counsel are to submit a proposed form of judgment in this case consistent with this memorandum of decision, the memorandum of decision on the Massachusetts Port Authority’s motion to dismiss counterclaims (docketed April 30, 2002), and the separate memorandum of decision and order dated November 18, 2003, concerning the remaining counterclaims of the City of Chelsea and the City of Boston.

 Two of the individuals, John Vitagliano and Robert Driscoll, Sr., have intervened as representatives of the Massachusetts Air Pollution and Noise Abatement Committee (MAPNAC).

 The defendant Secretary of Environmental Affairs takes a different approach, discussed below.

 See Memorandum of Decision and Order on the Massachusetts Port Authoriiy’s Motion for Judgment on the Pleadings, docketed on April 30, 2002.

 See Memorandum of Decision and Order on the Massachusetts Port Authority’s Motion to Dismiss Counterclaims, docketed on April 30, 2002.

 A dispute about exhibits must be addressed at the outset. The parties stipulated to the admissibility of certain exhibits, but disagree about whether certain documents that Boston and Chelsea characterize as comprising “the environmental record” are admissible in Massport’s case in chief, the injunction case. Among these documents are Massport’s 1975 final environmental impact report (final EIR) (trial exhibit [ex.] 15A and 15B); the Federal Aviation Administration (FAA) Logan Airport Capacity Enhancement Plan (ex. 25); the Logan Airside Improvements Feasibility Study (ex. 27); Massport’s 1999 draft environmental impact report (draft EIR) (ex. 30) and 2001 final EIR (ex. 32) relating to the Airside Project; the final certificate of the Secretary of Environmental Affairs (the Secretary) for the Airside Project (ex. 33); the FAA’s final environmental impact statement (final EIS) for the Airside Project (ex. 47); and the FAA’s record of decision (ex. 48).
Boston and Chelsea agree all these exhibits are admissible for purposes of their counterclaims, but not for the injunction case. This line-drawing does not make great sense. The environmental review proceedings in 1975 and more recently are integrally related to the injunction case: the 1976 injunction at issue here was the final chapter of two lawsuits challenging Massport’s compliance with MERA, and the environmental review documents from the Airside Project are very relevant to Massport’s request for relief from the 1976 injunction. There is good reason, therefore, to admit these documents for this entire case, without drawing fine distinctions between Massport’s claims and the various defendant parties’ counterclaims. But if it is necessary to deal more specifically with the hearsay objections that Boston and Chelsea raise, I conclude as follows. The 1975 final EIR documents are admissible for the non-hearsay purpose of showing the fact that Massport submitted them in connection with the Runways Project, and I have considered them solely for that purpose. There is no need, therefore to decide whether they should be admitted for the truth of their contents. As for the FAA Airport Capacity Enhancement Plan (ex. 25), I consider the factual information in it — e.g., growth of aircraft operations at Logan over time — substantively admissible as part of a public record. See Proposed Mass.R.Evid. 803(8). See also, e.g., Zeus Enterprises v. Alphin Aircraft Inc., 190 F.3d 238, 241-43 (9th Cir. 1999), and cases cited. With respect to FAA opinions or recommendations contained in that study, I have only considered them for the fact that these were opinions or recommendations made by the FAA, not for their truth. The Logan Airside Improvements Feasibility Study (ex. 27) should be admissible in its entirety, in light of the fact that Boston and Chelsea repeatedly referred to and relied on a portion of that exhibit (Figure 1-8 on p. 1-9), which seems to operate as a waiver of any objection to the document’s admissibility. With respect to Massport’s draft and final EIR for the Airside Project, I have limited my consideration to the portions of the final EIR to which Boston and Chelsea do not appear to object. I note, however, that much of the information contained in these documents on the issue of delay was testified to by witnesses at the injunction case trial. The Secretary’s final certificate is admissible for the purpose of showing what the Secretary found and did, and the factual portions of the certificate are admissible as part of a public record. Finally, I consider the FAA’s final EIS (ex. 47) and record of decision (ex. 48) admissible for all purposes, as there was no timely objection raised by Boston or any intervening defendant.

 The facts set forth in this section are taken from the statement of agreed facts submitted by the parties to this case and marked Exhibit 1.

 Indeed, except for a 2000-foot extension of one Runway in the 1960s, Logan’s Runway layout today is the same as it was in the late 1940s.

 The initials “GA/STOL” stand for “general aviation/short take-off and landing.” The term “Runway 14-32" describes the magnetic compass orientation of the proposed Runway. As Massport’s complaint describes, ”[e]ach Runway at Logan is designated by numbers indicating its directional compass orientation. (North=36, East=9, South=18, and West=27 ...).” (Complaint, footnote 1.) Thus “Runway 14-32" refers to a runway with a directional orientation of 140 degrees-320 degrees southeast-northwest.

 The relevant provisions of the original G.L.c. 30, §62, now appear as G.L.c. 30, §62A.

 Before 1975, Massport had initiated efforts to prepare a master plan for the future development of Logan Airport. There was a draft master plan in 1973, and then in July 1974, a master plan that proposed to complete the Runways Project in its entirely was prepared and submitted to the Massport board of directors. The board did not adopt the 1974 master plan but retained outside consultants in early 1975 to study and evaluate the master plan further. On September 28, 1975, the study team of consultants issued its report to Massport, entitled “Draft Logan Airport Master Plan Study,” which concluded that the GA/STOL Runway was not needed to satisfy existing or anticipated demand in the foreseeable future. This 1975 draft master plan study was thus submitted to the Massport board while the parties were involved in discussing the settlement of the 1974 actions. The evidence presented at the trial in the present injunction case indicated that this 1975 draft master plan study was very unusual in offering a negative assessment concerning future growth of airport operations, and in omitting any consideration of the likely arrival of airline industry deregulation, with a concomitant likelihood of an increase in air flight demand and operations. Nevertheless, in April 1976 Massport adopted a master plan for Logan that did not discuss deregulation and projected that without adding any capacity in the form of runways or otherwise, “Logan International Airport presently has sufficient capacity to accommodate today’s level of air service and to meet expected growth over the next 10 years without unacceptable congestion and delay." (Ex. 20, p. 1 [footnote omitted].)

 Peter Koff, Esquire, an attorney representing Boston in the 1974 cases who had participated in the settlement negotiations testified at trial in this case. Based on his testimony, I find that the plaintiffs in the 1974 actions, including Boston, wanted Massport to abandon permanently the construction of the GA/STOL Runway at Logan Airport, but Massport indicated it could not agree to such a condition, and insisted that the settlement recognize Massport’s right to seek relief from the injunction against building the Runway under Mass.R.Civ.P. 60(b)(5) and (6).

 The amendments and corrections made in September and October of 1974 to the original judgments in the 1974 cases are not relevant to this case.

 The FAA. study assumed that the 1976 injunction would apply to the proposed new runway 14/32 it was recommending. (See ex. 25, pp. 8, 9.)

 According to the FAA, within the four-year period from 1995-99, there were eighteen months when there was little substantive work going on, due to a change in the administration of Massport. (FAA record of decision, ex. 48, pp. 3-4.)

 The final certificate also identified certain other environmental mitigation commitments that Massport will be required to adopt in the context of the more general, airport-wide environmental reports (environmental status and planning reports, or ESPR) that Massport must file periodically for review by the executive office of environmental affairs. These additional mitigation resources include commitments to (1) work on an air quality initiative to arrest growth in smog precursors (nitrogen dioxide and other oxides of nitrogen [NOxJ, and volatile organic compounds [VOCs]); (2) pursue a waiver from the FAA in order to impose a restriction on “hush-kitted” aircraft operations at night at Logan; and (3) conduct follow-up air quality monitoring at and around Logan Airport.

 The FAA’s record of decision states: ‘The 10-knot wind restriction achieves the purpose and need of the Airside Project because it is predicted to reduce delays during northwest wind conditions. At the same time, a 10-knot wind restriction, as designed, prevents Runway 14-32 from changing overall Runway utilization patterns at Logan, enhances consistency of the Project with City of Boston land use planning objectives, and thus addresses some of the public’s concerns regarding Runway 14-32 . . .” (FAA record of decision, ex. 48, p. 23.)
The Secretary, in his final certificate, stated he could not approve at that time the concept of a wind restriction on the proposed 14/32 Runway (see final certificate, ex. 33, pp. 4, 12), but the FAA’s requirement that Massport implement the wind restriction controls.

 The increase in operations and passengers was more pronounced after the deregulation of the airline industry in 1978. In 1976, there were 11.4 million passengers at Logan, and 265,578 total operations. By 1979, the year following deregulation, passenger level grew to 15.3 million and total operations rose to 321,835. By 1990, passenger levels had climbed to 22.8 million, about double the number in 1976, and total operations were 424,568, approximately 63 percent higher than in 1976. Of particular significance, following deregulation, Logan experienced a tremendous increase in regional passengers and regional flights. The percent of flights that were regional grew from 19 percent in 1975 and 1976 to 28 percent in 1979, 36 percent in 1990, 35 percent in 2000 and 41 percent in 2001. Regional flights generally use smaller commercial jets or non-jet aircraft than long-distance national or international flights, and thus a greater number of airplanes are needed to accommodate the passenger level.

 The number of 510,113 is reported in the FAA’s 2001 Aviation Capacity Enhancement Plan (Boston ex. 1) at p. 22, figure 2-8. The FAA’s record of decision on the Massport Airside Project states that in 2000, the air traffic control tower at Logan Airport recorded 488,000 landings and takeoffs, which is consistent with a chart entitled “Historic Logan Passengers and Operations” (ex. 53), frequently cited by Massport. The difference in these numbers was not explained, but the difference does not appear to be material to this case.

 The lower number is derived from ex. 53; the higher number was testified to by Thomas Kinton of Massport.

 None of the witnesses for Boston and the interveners actually provided a timetable for demand increase, but simply reflected that the trend for demand over time was to increase.

 Massport, through computer models developed for its environmental impact analysis of the Airside Project, estimates that Logan Airport will reach its previous record of 27 million passengers in approximately 2008, will have approximately 29 million passengers in 2010, and will have about 37.5 million passengers in approximately 2018, with projected operations of 585,075. While these numbers are simply estimates used for planning purposes, there has been no evidence presented that calls their general reasonableness into question, and I accept them as generally reasonable projections of future growth. (The acting regional administrator of the FAA’s New England region, in the FAA record of decision dated August 2, 2002, used these estimates in her evaluations of the Airside Project.)

 The FAA accepted this estimate in its record of decision (ex. 48). It bears noting that the FAA considers 20,000 hours of annual delay as a threshold for a congested airport.

 The delay modeling referred to here was presented through the testimony of William Hoffman, who is president of Flight Transportation Associates, a company retained by Massport to conduct the delay modeling study and other technical studies in connection with the MEPA environmental review of the Airside Project. Hoffman was offered by Massport as a fact witness, a designation that Boston and the interveners have challenged. In particular, these parties take the position that Hoffman testified as an expert witness, should have been so designated, and as a sanction for Massport’s failure to so designate him, Hoffman’s testimony should be stricken. For reasons explained in note 49 below, I decline to do so.

 While a large increase in passengers, with related increases in demand, may well lead to an increase in commercial airline overscheduling, from the evidence presented I am not able to determine with any reasonable certainty when and in what amount such overscheduling might be likely to occur.

 Runway 33R is theoretically available as well, but it is only 2557 feet long, and cannot be used by most aircraft, which need a substantially longer runway for both take-offs and landings. Only certain small Cape Air aircraft and an ATR 42 are able to use the 33R Runway as a practical matter.

 One of the reasons for the reduction — in addition to simply having fewer runways available — is that having only two runways means that the air traffic controllers do not have two runways they can use solely for arrivals, and therefore cannot direct small aircraft to use one runway for arrival and larger aircraft to land on a separate runway. The FAA requires for safety reasons that aircraft be separated by certain distances in landing. If a large plane is followed by another large plane, the separation distance must be approximately two and one-half miles. However, if a large plane is followed by a much smaller plane, the separation distance must be increased to approximately five to six miles, to avoid wake vortexes — turbulence from the larger plane’s engines — adversely affecting the smaller aircraft. In a three-runway configuration, which generally makes two runways available for arrivals, large and small aircraft can be separated and the shorter separation distances can be used, but if only two runways in total are available, then, arrivals will generally need to take place on one runway, causing large and small aircraft to be queued in a single arrival stream, requiring the longer separation distances.

Again, 33R is theoretically available but its practical usefulness is very low because of its short length.

 No numerical breakdown of the 37 percent in terms of velocity — calm versus moderate versus strong — was provided. There seems to be no dispute, however, that northwest winds strong enough to cause a reduction in available runways constitute a significant portion of the 37 percent.
The prevailing wind is from the southeast approximately 17 percent of the year, from the southwest approximately_ percent, and from the northeast approximately 18 percent of the year. In theory, given the orientation of the runways and the requirement that planes land and take off into the wind, *179 the same forced reduction in available runways that occurs with moderate or strong northwest winds also occurs when there are moderate or strong winds from the southeast. However, while the wind does blow from the southeast at Logan Airport, there was little evidence as to how often Logan experiences moderate or strong southeast winds. The inference I draw at least from Hoffman’s testimony is that southeast winds do not present a significant capacity problem for Logan Airport.

 Given its orientation, in a northwest wind the runway would be used for arrivals only: in a southeast wind, the runway would be used for departures only.

 The most persuasive evidence supporting the statement in the text was the opinion offered by the MITRE Corporation in its review of the Airside Project for the FAA. (See ex. 47, appendix J.)

 The FAA record of decision states the estimated reduction to be 87 percent (ex. 48, p. 6), while Massport’s witness William Hoffman testified the estimated reduction was 90 percent. (Trial tr., January 23, 2003, p. 121.)

 As implied in the previous footnote, the FAA accepted and used these estimates in its record of decision.

 Focus on Massport’s predictions based on a fleet mix with a high proportion of regional jets in 2008 seems reasonable, in light of the evidence of the fairly remarkable growth' in the use of these lypes of aircraft at Logan Airport since 2000, and concomitant reduction in the number of turboprops. (See page 21 and note 32 above.)

 Appendix J is entitled “Review of Selected Topics by the Center for Advanced Aviation System Development (CAASD) of the MITRE Corporation,” and is dated May 2, 2002.
Boston and the interveners sought to introduce a series of other materials prepared by MITRE relating to its review of the supplemental draft EIS. All of these materials — copies of power point presentation slides and memoranda — have dates earlier than May 2002, and none of them was a part of the MEPA record or the FAA/NEPA record. They appear to be earlier versions or drafts relating to the final review appearing as Appendix J. No witness from MITRE was called at trial to testify about these earlier materials, their significance, or their relation to Appendix J; I admitted two of the documents into evidence, but I do not attach any weight to them because, among other reasons, I am not able to interpret them without the benefit of some explanatory testimony.

 I accept a point made in the MITRE review:
Predictions of high delays, such as those in the [supplemental draft EIS], are very sensitive to the estimates of capacity and demand upon which they are based. Very accurate predictions of future airport capacity, traffic levels, fleet mix, and airport operating procedures are required to predict high delays reliably. Such forecasts are difficult to make, especially for relatively long forecast horizons.
(Ex. 47, appendix J, p. 4; emphasis in the original.)

According to the final EIR, the particular part of Chelsea that falls within the 60 dB DNL contour is the section of the city with the highest population density. Massport is committed — and required by the Secretary — to provide soundproofing to residences within the 65 dB DNL contour as a mitigation measure, and, if necessary, to fund building code upgrades for residences to enable the soundproofing to be installed. There does not appear to be any plan by Massport to offer residential soundproofing for homes within the 60 dB DNL contour.

Boston and the interveners assert that Massport has abandoned this commitment. The record does not offer much support for this assertion, but in any event, Massport’s adherence to its AQI initiative is a matter to be resolved in the environmental review process rather than the injunction case.

There is no evidence that Massport has yet developed a PPP program, and thus it remains to be seen whether Massport will implement a truly effective PPP program. Again, however, this is more a question to raise as part of an environmental review process.

 Factors mentioned that weigh against use of Hanscom include Hanscom’s proximity to Logan, which might be a negative if the airline already has a base at Logan; the difficulty landing at Hanscom would pose for regional and other passengers with connecting flights out of Logan; and communily opposition. Factors in favor of Hanscom’s use include the fact that Hanscom is well located for regional carriers, is smaller, and is in the center of a large market of air travelers.

 Worcester Airport, in Worcester, Massachusetts, offers an illustration of this point. Massport operates Worcester Airport at the present time under a multi-year lease. Massport has invested substantial marketing and other resources into an effort to turn Worcester Airport into an active regional commercial airport that would complement and relieve Logan in much the way that the T.F. Green/Providence and Manchester, New Hampshire airports have done. Massport’s efforts at Worcester Airport have essentially failed. Commercial carriers that began service out of Worcester have chosen to cease doing business there. During the trial of this case, it was announced that the last commercial carrier flying out of Worcester airport was discontinuing its service.

 Massport essentially weaves into its arguments under Rule 60(b)(5) its separate claim, set out in Count I of the complaint, that the 1976 injunction should be vacated because Massport has complied with MEPA. If the claim is considered independently, it fails, because the history just reviewed in the text above defeats it. That is, the claim ignores the fact that the 1976 injunction, which barred construction of the proposed new runway, wholly replaced the original 1974 injunction, which did condition construction of the then-proposed runway on compliance with MEPA.

 As Massport emphasizes, the 1976 amended judgments expressly recognized its right to seek this relief, each stating: “As provided in Mass.R.Civ.P. 60(b)(5) and (6), this Court may modify or amend further this Further Amended Judgment upon the motion of any party if it shall be no longer equitable that this Further Amended Judgment should have prospective application or for any other reason justifying relief from the operation of the Further Amended Judgment...” (See p. 9 above.)

 The Supreme Judicial Court considered Mass.R.Civ.P. 60(b)(5) in Thibbitts v. Crowley, 405 Mass. 222 (1989). The court there reversed a trial court’s modification of a consent j udgment that provided for the plaintiffs purchase of property from the defendant on or before a specified date, and further provided that if the conveyance did not happen by that date, title was to remain in the defendant’s name. The court stressed the contractual nature of this consent judgment, and the trial court’s very restricted authority to modify it, id. at 226-27, but also specifically distinguished the case before it from those “in which rule 60(b) was used to modify consent decrees in situations of complex, on-going injunctive relief... These cases do not apply to the instant case, which involves only specific performance of a discrete transaction.” Id. at 228-29 (citations omitted).

 All parties agree that the 1976 injunction, and the amended j udgment of which it is a part, operates in substance as a consent decree, given that the parties to the 1974 actions agreed to and indeed proposed to the court the terms of the injunction and amended judgment.

 Boston also contends that even if Logan does experience delays, and even if one focuses on the watershed levels of *180 delay experienced at Logan in 1998, this does “not constitute the kind of onerous, unworkable circumstance” that would justify relief from the 1976 injunction under Rufo or otherwise. (Boston post-trial memorandum, pp. 14-16.) Boston goes on to suggest in effect that Logan would need to be almost choking in delay before the condition could properly be deemed onerous. The Court in Rufo does speak of “changed factual conditions [that] make compliance with the decree substantially more onerous.” Rufo, 502 U.S. at 384. But the Court’s discussion of the concept of changed circumstances and its repeated insistence on flexibility does not support Boston’s degree of unworkability before relief on the basis of changed circumstances would be warranted. Boston appears to be arguing for the “grievous wrong" standard of United States v. Swift & Co., 286 U.S. 106, 119 (1932). As indicated in the text above, I do not believe Swift to be an appropriate standard to apply in this case.

 There is another consideration relating to changed circumstances that deserves recognition, although it does not by itself make continued compliance with the 1976 injunction more onerous. In complete contrast to the situation with respect to the GA/STOL Runway, for Runway 14/32, Massport has adhered to the procedural requirements of MEPA and has obtained a final certificate from the Secretary approving the project. See page 40, note 53 below.

 Boston and Chelsea, joined by the other interveners, challenge all the delay modeling evidence, the evidence relating back to 1998 and the evidence projecting forward to 2008 and 2018. As indicated above, in part the challenge is based on the fact that William Hoffman, who was responsible for the delay modeling, was not identified as an expert witness. I agree with these parties that Hoffman did testify essentially as an expert witness, setting forth in substance his opinions and estimates about delay at Logan, although there is no question that these opinions and estimates were part of a finished work product independently prepared for the MEPA process, and not this injunction case. Nevertheless, counsel for Chelsea and Boston were able to depose Hoffman, and after he had testified at trial, were given an opportunity to recall him as a witness. I also note that Hoffman’s testimony tracked directly the delay materials contained in Massport’s environmental impact documents (the draft and final EIRs and the draft, supplemental draft and final EISs) filed with the Secretary and the FAA. Accordingly, the substance of that testimony could not have been a mystery to Chelsea or Boston by the time of trial in this case. Moreover, while they have argued that they did not put their own delay expert on the witness list following Massport’s designation of Hoffman as a fact witness, I do not believe Boston or Chelsea ever proposed, following Hoffman’s testimony, to amend their witness list and to call the expert witness. In all the circumstances, I conclude that Boston, Chelsea and the interveners had adequate opportunity both to know what Hoffman was going to testify to and to rebut it through cross-examination, or potentially calling their own witness, or both. While it would have been far preferable for Massport to have property designated Hoffman as an expert, exclusion of Hoffman’s testimony as a sanction is not called for.
During the trial, counsel for Chelsea argued that Hoffman's testimony was not admissible under principles articulated in Commercial Union Ins. Co. v. Boston Edison Co., 412 Mass. 545, 548-54 (1992). I am not certain whether Chelsea and Boston continue to press this objection. The Commercial Union case was decided before Commonwealth v. Lanigan, 419 Mass. 15, 25-26 (1994), and Canavan’s Case, 432 Mass. 304, 309-16 (2000), but it does discuss issues of reliability as they relate to computer simulations. Based on Hoffman’s testimony concerning the development of the delay model programs used for Logan Airport, and their comparison to and testing results against delay model programs used by the FAA, I find no basis to exclude the evidence as unreliable.

 There was evidence of ongoing FAA investigatory proceedings seeking to explore more generally demand management techniques and other measures to reduce congestion and delay at airports (see testimony of Gregory Walden), and of at least one FAA staff member’s opinion that in congested periods Massport could divert GA to Hanscom. (See Boston ex. 16; see also Boston ex. 60, p. 12.)

 As for a plan to make Hanscom a far larger venue for commercial flights — with the expectation that Logan would experience a concomitant reduction in demand (and associated delay) — I am not persuaded by the testimony of John Ready that Massport has the ability readily to transform Hanscom in this manner. The record reflects that a sizeable percentage of Logan passengers live in the Hanscom area, but what part of this group would or could use Hanscom for the types of flights they take is not clear. More significantly, there is no real evidence to support the premise that commercial airlines are likely to establish routes from Hanscom to capture these travelers. In fact, Hanscom has not had a positive experience in seeking to attract commercial business to Hanscom. (See 2000 L.G. Hanscom Field Environmental Status & Planning Report (July 2002), ex. 40, p. 3-10.)

 The amount of time a party has been “burdened” by the injunction and the prospect of its continuing are factors that courts have weighed in evaluating a request for relief under Rule 60(b)(5). See Alexis Lichine & Cie. v. Sacha A. Lichirus Estate Selections, Ltd., 45 F.3d 582, 586 (1st Cir. 1995). See also Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 380-81 (1992) (“The upsurge in institutional reform litigation .. . has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased.”).

 As previously discussed, I cannot agree with Massport’s suggestion that compliance with MEPA signals full satisfaction of the terms and purpose of the 1976 injunction. But the fact that the 1974 actions centered on Massport’s failure or refusal to comply with MEPA is important because the 1976 injunction was part of that litigation. Massport’s completion of the MEPA review process to the satisfaction of the Secretary this time around represents a significant change in circumstances that in my view should be weighed in the balance when reviewing the equities involved.

 Boston and the interveners argue that Massport has failed to justify the need to undo the environmental protections for Logan’s neighbors — persons living in the communities around Logan — that the 1976 injunction was intended to enforce. There is nothing in the record to reveal what environmental protections are incorporated into the injunction. One can take from the history of events between 1974 and 1976 that the parties opposing Massport in the 1974 actions did not want the GA/STOL Runway to be built, and succeeded in achieving this result through the 1976 injunction. It is only logical to assume, as well, that these parties were interested in protecting against negative environmental consequences that might accompany the proposed new Runway. But there is no evidence suggesting that the injunction itself provides, or that Massport agreed to provide, specific, affirmative protections from environmental burdens.

 It bears noting that the Secretary disagrees that Runway 14/32 will not enhance capacity, but could not determine from the MEPA record what the capacity increase might be. (See final certificate, pp. 4-5, 11-12.)