Botsford, J.
Introduction
The plaintiff Massachusetts Port Authority (Massport) has developed plans for a project at Logan International Airport (Logan) that includes a proposed new runway (Runway 14/32) located at the compass coordinates 14/32 (140 degrees-320 degrees) southeast-northwest) in the southwestern corner of the Logan airfield. The project is called the Airside Improvements Planning Project (Airside Project).
In its complaint in this case, Massport seeks to vacate a permanent injunction entered by this court in 1976 that arguably bars construction of the proposed Runway 14/32. The defendant Ci1y of Boston (Boston) and a number of the defendant interveners oppose any vacation or modification of the 1976 injunction. In response to Massport’s complaint, several of these parties have filed counterclaims against Massport, primarily focused on Massport’s alleged *207 noncompliance with the Massachusetts Environmental Policy Act (MEPA), G.L.c. 30, §§61-62H, in connection with the Airside Project.
The claims raised by Massport in its complaint relating to the 1976 injunction are the subject of a separate memorandum, of decision and order. (See Memorandum of Decision and Order for Judgment, dated November 17, 2003 [17 Mass. L. Rptr. 125].) The present memorandum of decision concerns several of the counterclaims filed by Boston and the defendant intervener city of Chelsea (Chelsea).[3]
Chelsea brings three counterclaims challenging Massport’s compliance with MEPA: (1) Massport has failed adequately to identify all reasonable alternatives and the environmental impacts of the Airside Project and has failed to use all practical means and measures to minimize environmental damage, as required by MEPA, G.L.c. 30, §61; (2) Massport’s Final Environmental Impact Report (FEIR[4]) and Final Environmental Impact Statement (FEIS), prepared as part of the environmental review process, fail to identify or analyze, or both, the environmental consequences of reasonable alternatives to the project, in violation of another provision of MEPA, G.L.c. 30, §62B; and (3) the Draft Environmental Impact Report (DEIR[5]) fails to set forth the environmental consequences of the Airside Project and alternatives to the project, in violation of §62B. Chelsea seeks a declaration that Massport has not met its obligations under MEPA, and preliminary and permanent injunctions restraining Massport from constructing the Airside Project.
Boston has two remaining counterclaims, both of which also concern Massport’s MEPA compliance. In one, Boston challenges the decision by the Secretary of Environmental Affairs (the Secretary) not to reopen the MEPA environmental review process for the Airside Project to review (a) the impact of changes in demand and other conditions caused by the events of September 11, 2001, and (b) questions about Massport’s willingness or ability to comply with its Air Quality Initiative (AQI). The other counterclaim seeks injunctive relief under G.L.c. 214, §7A, barring Massport from proceeding with the Airside Project without carrying out its plan to implement the AQI.
Massport’s claims concerning the 1976 injunction were tried before me without a jury in January and February 2003. Because the remaining Chelsea and Boston counterclaims relate to the MEPA environmental review process conducted by the Secretary, however, they focus on the MEPA record that was before the Secretary, with the addition of Massport’s findings made under G.L.c. 30, §61 (§61).[6] See Sierra Club v. Commissioner of Environmental Management, 439 Mass. 738, 740, 746-49 (2003). Accordingly, that record rather than the testimony of witnesses and other evidence unrelated to the MEPA review process that was introduced at trial provides the basis for this memorandum of decision.
Background[7]
In 1995, Massport commenced the MEPA review process by filing with the Secretary an Environmental Notification Form (ENF) with respect to the Airside Project, proposing to construct Runway 14/32 along the southwesterly edge of the Logan airfield, and to make various other taxiway and operational improvements. Massport proposed Runway 14/32 as necessary to alleviate flight delays caused by moderate and strong northwest winds. The runway would be used unidirectionally only, so that all arrivals would come from the southeast and all departures would fly toward the southeast, over the Boston Harbor.
On November 22, 1995, the Secretary issued a certificate on the ENF stating that the Airside Project would require the preparation of an environmental impact report and that Massport must include in its DEIR a discussion of alternatives to Runway 14/32. “The DEIR should discuss these off-airport alternatives [increased use of other, existing regional airports and increased use of high speed rail) and analyze the potential each has to divert passengers and/or cargo from (and lower the operational impacts of) Logan Airport.” (Secretary’s ENF certificate, p. 3 [ex. 29].)
On February 1, 1999, Massport prepared and filed a combined DEIR which was the subject of a public comment period, including two public hearings held in April 1999. On May 7, 1999, the Secretary issued a certificate on the DEIR in which he found that it adequately and properly complied with MEPA and its implementing regulations, 301 Code Mass. Regs. §11.00. In the certificate, the Secretary listed three issues that would shape the preparation and review of the FEIR: (1) the regional transportation network, and particularly how planned improvements relating to regional airports in Worcester, Manchester, and Providence may affect the environmental impact of the Airside Project; (2) an enhanced analysis of peak period pricing (PPP)[8] as an alternative to runway 14/32 in reducing delays;[9] and (3) noise and air pollution and traffic impacts upon low-income and minority communities neighboring Logan, whether or not runway 14/32 is constructed, and Massport’s commitment and measures to minimize such impacts. (DEIR certificate, pp. 3-4, 8-10, 12, 14-15, 16-18 [ex. 31].)
On March 1, 2001, Massport submitted its FEIR to the Secretary. The FEIR proposed a number of changes to Logan’s air field operations, termed “improvements” by Massport. It grouped these improvements in various combinations and presented them as project alternatives. They are the following:
Alternative 1: construction of unidirectional runway 14/32, taxiway improvements, reductions in approach minimums for certain runways at Logan, and a PPP program;
*208 Alternative 1A: all improvements included in Alternative 1 except the PPP program (referred to in the FEIR as the “preferred alternative”);
Alternative 2: all improvements included in Alternative 1 except runway 14/32;
Alternative 3: operational improvements (i.e., reduced approach mínimums) and PPP (referred to in the FEIR as the “no build” alternative).
Alternative 4: no changes (referred to in the FEIR as the “no action” alternative).
The FEIR selects Alternative 1A — runway 14/32 and all other proposed improvements except the PPP program. (FEIR (ex. 32].)[10]
On June 15,2001, the Secretary issued a certificate on the FEIR, concluding that it “adequately and properly complies with . . . MEPA.. . and its implementing regulations (301 Code Mass. Regs. 11.00).” (Certificate of the Secretary of Environmental Affairs on the Final Environmental Impact Report [FEIR certificate] p. 1 [ex. 33].)
The Secretary stated that the central question before him was
. . . whether Massport is operating the airport in a manner that avoids, minimizes, and mitigates environmental impacts in light of its obligations under MEPA. In this certificate I have identified those principal measures identified in the FEIR and/or the ESPR][11]] — in particular, the NOx cap, noise mitigation, revamping of the PRAS[12]goals, regionalization, and TMA[13] participation — which, taken together, give me confidence that Massport is able to meet its [G.L.c. 30,] Section 61 obligations.
(FEIR certificate, p. 5.)
The Secretary found that the FEIR adequately addressed the issues of the Airside Project’s purpose and need, given the results of various delay analyses that Logan was one of the most delay-prone airports in the country, that the northwest wind conditions were responsible for about one-third of the delays, that the use of regional jets had increased to 16-19 percent of Logan’s fleet, and that the total numbers of passengers and operations at Logan more than doubled between the 1970s and June of2001. The Secretary concluded that the appropriate alternative was Alternative 1, which proposed all improvements including the PPP program, rather than Massport’s preferred alternative, that omitted the PPP program. (FEIR certificate, pp. 3-4, 8-10.) Accordingly, the FEIR certificate requires Massport, in its findings under G.L.c. 30, §61 (§61 findings),[14] to commit to putting in place as a project element an enforceable PPP program, or an alternative demand management program with comparable effectiveness. (FEIR certificate, p. 9.)
On the subject of air quality, the Secretary expressed his concern in the FEIR certificate that in 2001, Logan was the sixth largest source of nitrogen oxides (NOx) emissions in the Commonwealth. The
FEIR certificate goes on to discuss Massport’s agreement to impose a cap on certain smog emissions though the implementation of its AQI program, entailing a combination of on and off-airport measures and reductions:
Massport has voluntarily committed itself to the Air Quality Initiative (AQI) . . . AQI constitutes a first-in-the-nation airport cap on net smog precursors (NOx and VOCs) at or below year 1999 levels, regardless of any future increases in passengers or operations. Without this cap, NOx was projected to rise from 2,444 tons/year in 1999 to 3,150 tons/year by 2015.
Massport has agreed to work with EOEA, through the ESPR process, to determine how best to structure an effective and enforceable AQI that will ensure the avoidance of air pollution impacts . . . Based on the foregoing, I find that issues of air quality impacts have been adequately addressed for purposes of MEPA review.
(FEIR certificate, pp. 13-14.)
The Secretary concluded in his certificate that Massport’s FEIR responded to his guidance in the DEIR certificate, addressed the Federal requirements of Executive Order 12,898 on environmental justice, and adequately addressed issues of environmental justice for purposes of MEPA review.
The Secretary directed Massport as follows:
Prior to project commencement, Massport must prepare and adopt a Section 61 Finding pursuant to MEPA, which details all of the agency’s enforceable commitments to actions that will avoid, minimize, or mitigate the project’s environmental impacts. The project will also require a Conservation Permit from the Department of Fisheries, Wildlife, and Environmental Law Enforcement, pursuant to the Massachusetts Endangered Species Act.
As required by [MEPA], the Section 61 Findings that will be adopted by Massport, prior to project commencement, must contain all of the mitigation commitments that emerge from the EIR process. The FEIR includes Proposed Section 61 Findings for each area of impact associated with the project. These Findings must be revised to incorporate all additional mitigations required under this certificate, as well as any further commitments within MEPA jurisdiction that may arise during the federal review process.
(FEIR certificate, pp. 3, 24.)
On June 18, 2001, Massport issued its §61 findings, which read in pertinent part:
The Authority hereby finds that: (a) the environmental impacts associated with the [project] are ... *209 adequately described and evaluated in the ENF, DEIR and FEIR and the description of such environmental impacts set forth in said documents is adopted as a specific finding herein, and (b) by implementing the mitigation measures set forth in the FEIR as modified by and as authorized and directed by this resolution, all feasible means and measures will be taken to avoid or minimize any environmental impacts as determined by this resolution.
The Authority hereby makes the findings set forth below in accordance with M.G.L.c. 30, Section 61 and hereby authorizes and directs the Executive Director to implement the measures described herein: . . .
(Resolution and Vote of Massport Board, p. 2 [ex. 51].) The authorized measures include, in relevant part, Massport’s commitments to: (1) support a regional transportation policy to expand the use of regional airports and other transportation modes to provide relief to Logan Airport: (2) ensure that residential soundproofing is available to affected residences in Chelsea, East Boston and South Boston for eligible buildings, and that buildings which are currently ineligible due to building code considerations will receive building code upgrades as necessary to allow installation of sound insulation: and (3) implement an enforceable PPP or an alternative demand management program with comparable effectiveness.[15] (7d., pp. 2-11.) The §61 findings contain no express reference to the AQI.
On June 19, 2001, Massport filed its complaint in this action seeking to lift the 1976 injunction.
On December 17, 2001, Boston filed with the Secretary a Notice of Project Change (NPC), asserting that the events of September 11, 2001, changed the aviation industry in ways that called for further environmental review of the Airside Project. In particular, Boston asserted that the reduced demand at Logan raised questions about the need for the Airside Project, whether different alternatives might better meet the project’s objectives, and asserted that the dramatic decline in Logan’s revenues due to reduced aviation activity would impede Massport’s ability to meet its mitigation commitments such as the AQI/NOx cap and the promotion of increased utilization of other regional airports and travel modes. (Boston 2001 NPC, pp. 2, 3 & 5 [ex. 41].)
The Assistant Secretary of the Executive Office of Environmental Affairs responded to this NPC by letter dated December 21, 2002. He stated that the circumstances described in Boston’s NPC
... do not constitute a “material change” within the meaning of the MEPA Regulations, 301 CMR 11.00. Therefore a Notice of Project Change (NPC) is not required for the above project. Your letter cites the drop in activity levels at Logan Airport since September 11 as a project change that would require additional environmental analysis. It has been the consistent policy of the MEPA Office to accept third-party NPCs only under very limited circumstances, involving new types or increased levels of adverse environmental impacts exceeding the impacts previously studied . . .
The record for the Airside [P]roject shows that if activity levels remain below projected levels, environmental impacts will be lower as well. . . Therefore, even if activity levels remain depressed, the EIR analysis would continue to serve as a conservative “worst-case” analysis. Finally, under the statute and MEPA Regulations the role of the Environment [sic] Secretary is to ensure adequate analysis of a project’s environmental impacts. State law entrusts the decision as to whether a project is needed, or when it should be undertaken, to the proponent: in this case, Massport.
Your letter also cites concerns that reductions in Massport funding might interfere with the agency’s ability to carry out the mitigation commitments described in [Massport’s] Section 61 Finding. Although a change in project mitigation potentially constitutes a project change, it would be purely speculative at this point to assume that an agency of the Commonwealth will at some undefined future point fail to carry out its legally enforceable duties under state environmental law. If, upon the actual commencement of a project, an agency stated or made it clear that it did not intend to implement its attendant mitigation obligations, legal remedies would be available to the affected parties.
(Response to Boston’s Notice of Project Change, pp. 1-2 [ex. 42].)
In June 2002, a year after completion of the MEPA review process, the FAA published the Final Environmental Impact Statement (FEIS) for the Airside Project pursuant to the National Environmental Policy Act (NEPA). On August 2, 2002, the FAA issued its record of decision which, among other things, approved of proposed Runway 14/32. However, the FAA required that, as a measure to restrict noise impacts, the runway could only be used during northwest and southeast winds of ten knots or more.
Additionally, in the FEIS, the FAA issued the following response to comments regarding the AQI:
The Air Quality Initiative (AQI) for Logan Airport, which is not related to the Airside Project, was developed by Massport as a strategy for retaining NOx emissions associated with Logan Airport operations at 1999 levels. EOEA approved this program in March 2001 and Massport is fully committed to its implementation. However, since the AQI was published, the aviation industry has undertaken an intense review of the program. The FAA has re *210 quested that the program be suspended ... The Air Transport Association, the primary air carrier trade association, has expressed vigorous opposition to the program asserting that implementation of the program would violate federal law. The FAA notes that states are preempted from taking actions to control emissions from aircraft engines. Moreover, the tragic events of September 11th have taken a profound toll on the aviation industry and on Logan Airport, in particular. According to Massport, until financial conditions return to pre-September 11th standards, implementation of the AQI is not feasible. Nonetheless, Massport is committed to the program and the progress of the AQI will be reported on annually in the Logan Airport Environmental Statue (sic) Planning Report (ESPR) or its annual update, the Environmental Data Report. The FAA expects that the AQI -will be implemented in a manner consistent with applicable federal law.
(FEIS, vol. 2, part 6, Response to Comment 6.3 [ex. 47].)
On July 30, 2002, Chelsea filed an NPC which was supported and supplemented by Boston in letters to the Secretary dated August 16 and September 9,2002. In the latter, Boston expressed concern over Massport’s apparent withdrawal of its commitment to the AQI. (Letter from City of Boston to Secretary Durand, September 9, 2002, p. 1 [ex. 44].)
On September 20, 2002, the Secretary responded to Chelsea’s NPC and determined that no material change in the Airside Project had occurred and that no further environmental review of the project was required. On the subject of Massport’s AQI, the Secretary agreed that Massport’s failure to implement this program would constitute a material change in the Airside Project, requiring submission and review of an NCP. The Secretary denied, however, that the FEIS response to comment 6.3 (quoted above) constituted an unequivocal elimination of the AQI, and stated that he was requiring Massport to address how it was satisfying the AQI commitments in its separate, to-be-filed, 2001 Environmental Data Report for Logan Airport as a whole. (Secretary’s response to Chelsea’s NPC, p. 4 [ex. 45].)[16]
By letter dated October 9, 2002, Boston, through its counsel, notified the Secretary and Massport that it would assert the counterclaims currently at issue, on the grounds that Massport’s environmental documents do not specify the anticipated implementation schedule for the AQI.
Discussion
1. Jurisdiction
At issue here are counts I, V, and VI of Chelsea’s counterclaims, and Counts V and VI of Boston’s counterclaims. Chelsea asserts that its Count I states a claim under §61 of MEPA, G.L.c. 30, §61 (§61), and that Counts V and VI state MEPA claims under G.L.c. 30, §62B (§62B). Boston states that its Count V brings a claim under MEPA, G.L.c. 30, §§62-62H (§§62-62H), and that Count VI states a claim pursuant to G.L.c. 214, §7A.
Massport argues that all of these counterclaims should be dismissed, although for different reasons. With respect to Chelsea, Massport contends that the counterclaims are untimely because Chelsea asserted them more than 120 days after the Secretary published notice of the availability of Massport’s FEIR, contrary to §62H;[17] as for Boston, Massport states that the court lacks subject matter jurisdiction to review a discretionary decision by the Secretary not to act on an NPC, and therefore not to reopen an environmental review process.
a. Jurisdiction to Consider Chelsea’s Counterclaims
There is no question that §62H requires any action seeking to challenge a FEIR for a public project (such as the Airside Project) to be commenced “no later than” 120 days after notice that the FEIR is available has been published. (See note 17 above, where the statute is quoted.) In denying Massport’s original motion to dismiss these counterclaims of Chelsea, I concluded that they were timely because Chelsea’s act of filing them as counterclaims permitted application of the “relation back” doctrine. In particular, since Massport had filed its complaint on June 19, 2001, if Chelsea’s counterclaims were deemed to have been filed as of that date, they were filed within 120 days after the Secretaiy published notice of the availability of the FEIR, and therefore were timely. (See Memorandum of Decision and Order on the Massachusetts Port Authority’s Motion to Dismiss Counterclaims, docketed on April 30, 2002.) Massport responds that since my ruling, the Supreme Judicial Court has decided Nett v. Bellucci, 437 Mass. 630 (2002). Nett mandates dismissal of Chelsea’s counterclaims Massport says because in Massport’s view, §62H is a statute of repose and Nett makes clear that the “relation back” doctrine does not apply to statutes of repose. See 437 Mass, at 635-36.
The difficully with Massport’s argument is that §62H does not appear to be a statute of repose. The Supreme Judicial Court has described §62H as “essentially a statute of limitations.” Cummings v. Secretary of Envtl. Affairs, 402 Mass. 611, 613 (1988). See Walpole v. Secretary of the Executive Office of Envtl. Affairs, 405 Mass. 67, 70 (1989). Massport sets out a number of reasons why it believes this language does not really mean what it says, but I am not prepared to follow Massport down this path. Massport fears that if Chelsea can proceed with its counterclaims, it will undermine the important deadlines set out in the MEPA statute and the policies favoring timely review of environmental projects that they support. But Chelsea’s ability to bring counterclaims is a result of the highly unusual situation presented by this case: a project proponent that has been successful in its *211 MEPA review brings an action in court because there is an independent injunction in place that may bar the project despite MEPA compliance, thereby creating an opportunity for project opponents to file counterclaims. In the circumstances, I remain unconvinced that Chelsea’s counterclaims are time-barred.
That is not the end of the jurisdictional question, however. Massport’s claim that Chelsea’s counterclaims should be dismissed because they are brought too late may be focusing on the wrong end of the time line. Section 62H of MEPA itself does not confer jurisdiction on the Superior Court to entertain a challenge to the validity of an agency’s compliance with MEPA or to the Secretary's certificate approving an EIR. See Cummings v. Secretary of Envtl. Affairs, supra, 402 Mass, at 613. If there is jurisdiction over such claims, it lies under G.L.c. 214, §7A.[18] See Sierra Club v. Commissioner of the Dept, of Envtl. Management, supra, 439 Mass, at 739 n. 1. In Sierra Club, the court concluded that an action challenging the validity of an agency’s §61 findings and, through them, the validily of the Secretary’s certificate approving a FEIR, would lie under c. 214, §7A, “after the permit authorizing a project has been approved.” Id. at 745, citing Enos v. Secretary of Envtl Affairs, supra, 432 Mass, at 138-39, 142. See also Enos, 432 Mass, at 142 n. 8.
The Secretary’s FEIR certificate in this case indicates that Massport will need to obtain a conservation permit from the Natural Heritage Program before it may begin any work on the centerfield taxi portion of the Airside Project. (FEIR certificate, p. 23.) However, the FAA record of decision indicates that the FAA has deferred consideration and approval of the centerfield taxi aspect of the project. (See record of decision, pp. 3, 24-26 [ex. 48].) Accordingly, work on the centerfield taxi appears to be on hold. None of the parties has provided information about what, if any, other permits or approvals might be necessary for Massport to obtain before it commences construction on Runway 14/32.
In these circumstances, one might ask whether Chelsea’s counterclaims can properly be reviewed at the present time. However, this is not an argument that Massport has sought to raise, and I consider it waived. Therefore, I consider below the merits of Chelsea’s counterclaims.[19]
b. Jurisdiction to Consider Boston’s Counterclaims
Boston’s counterclaims raise different issues. Massport asserts that counts V and VI should be dismissed because they raise no issue that is subject to judicial review.[20] I agree, at least with respect to count V.
In Cummings v. Secretary of Envtl Affairs, supra, the court ruled that the Superior Court did not have jurisdiction to review the Secretary’s decision that an EIR was not required. 402 Mass, at 613-18. Analytically, there seems little difference between a discretionary determination of the Secretary not to require an EIR for a project and the equally discretionary decision not to reopen a completed environmental review process in a case where an EIR was originally required. Moreover, in this situation, as in Cummings, it is clear that the challenge must be directly to the Secretary’s decision, since one cannot argue that Massport has failed to comply with MEPA by not reopening and revising its FEIR when the Secretary has not demanded that Massport do so. See Cummings, 402 Mass, at 616. Compare Enos v. Secretary of Envtl Affairs, supra, 432 Mass, at 139-40 (“... case law in this area... demonstrates a decided reluctance to allow plaintiffs to challenge decisions of the Secretary under MEPA ... If a challenge cannot be maintained to the Secretary’s decision that an EIR is not required, it seems only logical that a challenge cannot be maintained when an EIR is required and approved . . .”).
On the other hand, as it has pointed out, Boston occupies a different position than the citizen plaintiffs in Cummings or Enos. Logan is located in Boston, and more particularly, the Airside Project is located in Boston. In the Enos case, the court observed that in certain circumstances, a town in which a project was located would have “standing to maintain a declaratory judgment action challenging a decision made by the Secretary concerning a proposed project’s EIR.” Enos v. Secretary of Envtl. Affairs, 432 Mass, at 141. See Walpole v. Secretary of the Executive Office of Envtl. Affairs, supra, 405 Mass, at 71-72. Cf. Villages Development Co. v. Secretary of the Executive Office of Envtl. Affairs, 410 Mass. 100, 105-07 (1991).
The jurisdictional knot presented here is difficult to untie. However, the court’s discussion in Enos of the special position held by a city or town in which a project is located suggests that a municipality’s standing does not derive automatically from its status as the host municipality for the project. Rather, what matter are “both the nature of the [city’s] interests and its alleged injury . . .” Enos, 432 Mass, at 141.[21] In this case, Boston obviously has a strong general interest in matters relating to airfield construction projects at Logan, in light of Logan’s location right in the middle of several densely populated Boston neighborhoods and the potential environmental impacts that such projects may impose. But in contrast to the situation confronting the town of Walpole in the Walpole case (see note 21 above), the Secretary’s challenged action here — his refusal to reopen the Airside Project environmental review process to consider the impact of September 11 or to examine, at the present time, the issue of whether Massport will implement its AQI — does not immediately impair any rights of Boston, or impose any specific or immediate injury, financial or otherwise. In the particular circumstances of this case, I con- *212 elude that Boston does not have standing to seek declaratory relief against the Secretary with respect to his negative responses to Boston’s and Chelsea’s NPCs.[22] Count V of Boston’s counterclaims must be dismissed.
Count VI of the counterclaims challenges Massport’s alleged intention to proceed with the Airside Project despite its having allegedly abandoned its commitment to implement the AQI. This claim, expressly brought under G.L.c. 214, §7A, may be viewed perhaps as substantively similar to Chelsea’s counterclaims challenging generally the adequacy of Massport’s §61 findings on the Airside Project and the underlying environmental review of the project conducted pursuant to §§62-62G.[23] Nevertheless, I conclude — in contrast to my view of Chelsea’s MEPA claims — that the claim should be dismissed on ripeness grounds. Despite the passage previously quoted from the FEIS comments (see p. 12 above), Massport asserts it remains committed to its plan of implementation for the AQI, and there is no evidence it has taken any action that is inconsistent with the position. Accordingly, no basis exists for Boston to claim that at the present time damage to the environment related to AQI “is occurring or is about to occur . . .” G.L.c. 214, §7A. See Walpole v. Secretary of the Executive Office of Envtl. Affairs, supra, 405 Mass, at 71.[24] Count VI of Boston’s counterclaims should be dismissed, without prejudice.
2. Chelsea’s Counterclaims
Chelsea claims that Massport has not fulfilled its obligations under §§61 and 62B to prepare an EIR that adequately describes the reasonable alternatives to the Airside Project, specifically, increased commercial use of Hanscom Field and demand management techniques other than or in addition to PPP. Chelsea has also claimed during the life of this case, but may not still be claiming, that the FEIR is faulty because it does not adequately identify and analyze the environmental impacts of the project on low-income and minority populations.[25]
a. Standard of Review
Massport’s findings and determinations required by §61 are more regulatory than adjudicatory in nature. See Sierra Club v. Commissioner of the Dept of Envtl. Management, supra, 439 Mass, at 745-46. Neither the “informal and informational public consultation” permitted under EIR review nor the Secretary’s certification constitutes an adjudicatory proceeding. Id. at 747.
The Secretary, “a disinterested public official with expertise in environmental matters,” Cummings v. Secretary of Envtl. Affairs, supra, 402 Mass, at 617, has broad discretion in identifying the environmental impacts of the Airside Project. See Sierra Club, 439 Mass, at 748. In this context, the court evaluates Massport’s §61 findings and the EIRs under the arbitrary and capricious standard of review, such that they will be found improper only if they lack a rational basis. Id. at 746, 748. “The process by which the information is gathered, identified, and applied to the statutory standards under MEPA must be logical, and not arbitrary or capricious.” Id. at 749.
b. Discussion of Alternatives
With respect to Hanscom Field, Chelsea maintains that Massport failed to explain the reasons for concluding that it was not a feasible alternative to Runway 14/32, and to describe the environmental consequences of using Hanscom as an alternative. A review of the record on this issue is useful.
The DEIR included the following discussion about Hanscom Field:
Hanscom, which is classified by the FAA as a general aviation reliever airport, provides significant relief to Logan by handling a high volume of general aviation activity, from 150,000 to 200,000 operations annually. Hanscom Field has the second highest level of aircraft operations among New England airports ranking second behind Logan . . .
Massport is planning a number of improvements to Hanscom Field to ensure its continued role as New England’s premier general aviation facility . . . The Hanscom facility can handle all types of general aviation activity, including private, business, charter and air taxi operations. No regional carriers have successfully served the airport in the past fifteen years.
(DEIR, p. 2-41 [ex. 30].) In response to many comments received by the Secretary that commercial service at Hanscom Field be considered as a project alternative, the Secretary stated in the DEIR certificate:
Massport argues that commercial service at Hanscom is not likely to constitute a feasible alternative to Logan in the foreseeable future, and that Hanscom is better suited to remain the region’s principal general aviation (GA) airport. (In 1998, there were approximately 183,000 GA operations at Hanscom, compared with 31,000 at Logan.) To back up Massport’s contention, the FEIR should address in qualitative terms the environmental impacts of commercial service to Hanscom; opportunities to divert an even higher share of Logan’s GA operations to Hanscom and other regional airports; and any legal impediments to such measures.
(DEIR certificate, p. 10.)
Massport submitted its FEIR to the Secretary in March 2001. Massport responded to the DEIR certificate’s instruction regarding Hanscom Field as follows:
Hanscom Field, which serves as a general aviation reliever airport to Logan Airport, already accommodates a significant number of aircraft operations (183,000 operations in 1998). The Hanscom Field *213 activity includes private, business, charter, and air taxi operations that might otherwise use Logan Airport. Since the Airside Project Draft EIS/EIR was filed, Shuttle America, a newly founded airline, began commercial scheduled operations at Hanscom Field, offering limited turboprop services to short-haul regional markets — Trenton, Buffalo, Hartford (discontinued), Wilmington, Delaware (discontinued), and Greensboro. Shuttle America is also conducting operations between Hanscom and New York LaGuardia Airport. While Massport supports commercial service at Hanscom Field consistent with its established policy (60-seat regulation), it believes that Hanscom Field will maintain its role as a major general aviation reliever, and that its geographic proximity to Logan, Worcester Regional and Manchester airports will prevent its development as a significant commercial airport. Additionally, commuter airlines serving Logan Airport are unlikely to move a significant number of flights from Logan Airport to Hanscom Field, since approximately 50 percent of passengers on Logan Airport’s commuter flights connect to other Logan Airport flights. However, any new commercial service initiatives proposed for Hanscom Field shall be reviewed for consistency with the Hanscom GEIR (HGEIR), its Annual Updates, and applicable regulatory limitations, and shall be considered by the Hanscom Field Advisory Committee.
(FEIR vol. 4, Response to Comments, C. 18.) Appendix B to volume 3 of the FEIR contains a summary of the 1995 baseline conditions and environmental impacts at and around Hanscom Field for hypothetical operations for the years 2000 and 2010, assuming 3 percent growth in regional commercial commuter services. The summary reports that such use of Hanscom Field would result in a significant increase in noise due to more operations, and an increase in emissions due to a shift in the fleet mix and additional total operations as well as roadway traffic, but that the total emissions for Hanscom Field would remain small compared to total emissions in Middlesex County. (FEIR, vol. 3, Appendix B, pp. 2, 7.)
EIRs ordinarily must address five aspects of project alternatives:
1. all feasible alternatives, including but not limited to those indicated in the Scope;
2. the alternative of not undertaking the Project (i.e., the no-build alternative) for the purpose of establishing a future baseline in relation to which the Project and its alternatives can be described and analyzed and its potential environmental impacts and mitigation measures can be assessed;
3. an analysis of the feasible alternatives in light of the objectives of the Proponent and the mission of any Participating Agency, including relevant statutes, regulations, executive orders and other policy directives, and any applicable Federal, municipal, or regional plan formally adopted by an Agency or any Federal, municipal, or regional governmental entity;
4. an analysis of the principal differences among the feasible alternatives under consideration, particularly regarding potential environmental impacts;
5. a brief discussion of any alternatives no longer under consideration including the reasons for no longer considering those alternatives.
301 Code Mass. Regs. §11:07(6)(f).
Massport’s MEPA submissions adequately addressed the issue of why the diversion of more commercial aviation to Hanscom Field was not a feasible alternative to Runway 14/32. Massport advanced two reasons for use of Hanscom Field as a major general aviation reliever for Logan rather than a primary commercial reliever airport: (1) Hanscom’s geographic proximily to Logan, Worcester and Manchester Airports impairs its development as a significant commercial airport; and (2) commuter airlines serving Logan are unlikely to move a substantial number of flights from Logan to Hanscom Field since approximately 50 percent of passengers on Logan’s commuter flights connect to other Logan flights. (FEIR, vol. 4, Response to Comments, C. 18.)
Chelsea challenges the first basis, claiming that Massport has not backed up this assertion with evidence. The well-documented growth in the use of Manchester (and T.F. Green/Providence) Airports, causing a significant diversion of commercial flights from Logan, [26] and extensive plans to expand use of Worcester Airport,[27] provide sufficient support for Massport’s “geographic proximity” reasoning.[28]
Where MEPA submissions show that project alternatives were both discussed and considered by the project proponent, the FEIR and §61 findings are not deficient for failure to consider alternatives. See Sierra Club v. Commissioner of the Dept of Enutl Affairs, supra, 439 Mass, at 750-51. Massport’s environmental documents satisfy the regulatory requirement that they contain a brief discussion explaining why Hanscom Field is not a feasible alternative to the Airside Project, and the explanation is neither arbitrary nor capricious.[29]
With respect to demand management, there is no dispute that both the DEIR and FEIR contain extensive discussions of a PPP program as a demand management technique, that the Secretary viewed PPP as an effective tool for reducing delays, and that, in the Secretary’s opinion, it would produce the additional benefit of reducing noise and air pollution. Chelsea argues that Massport ought to have articulated its reasons for no longer considering demand management techniques other than PPP, such as, e.g., those described in the FEIR. (See FEIR, pp. 3-37 to 3-41.) Massport was not required to do so.
*214 The FEIR describes two general types of demand management tools, regulatory and economic. It states that regulatory programs, which limit the number of flights that can be accepted at an airport, are subject to review by the FAA, and not often approved. (FEIR, pp. 3-37 and 3-40.) Economic demand management programs, including PPP, charge airfield users a higher fee during peak hours in order to reduce demand. In its discussion of economic-based approaches, the FEIR documents how Massport’s previous demand management programs imposing landing fees failed, where one implemented in 1982 met strong resistance, and the 1988 program was found to be discriminatory. Among the existing economic-based programs implemented at airports in London, New York, and Sydney, all impose surcharges during peak hours; the fees may apply to landings, all operations, or vary with aircraft weight.
Massport explained its preference for the PPP:
Peak Period Pricing was chosen from alternative demand management strategies because it has been effective in other industries and because it is excluded from review under Part 161 of the Federal Aviation Regulations, which sets standards for airports that wish to restrict access for Stage 3 aircraft. Other demand management tools, such as slots or caps, are discouraged under current federal guidelines and would require extensive analysis under Part 161. The current environment where Congress has moved to eliminate slots at High Density Airports suggests that imposing slot controls would not be approved.
(FEIR, p. 3-36.) This statement, when read with the descriptions of regulatory and economic-based approaches adopted at domestic and international airports, adequately explains why Massport no longer considered demand management alternatives other than PPP. See Sierra Club, supra, 439 Mass, at 751.
c. Environmental Justice[30]
Chelsea has challenged the FEIR’s conclusion that the proposed Airside Project, and particularly Runway 14/32, do not cause a significant, adverse environmental impact disproportionately affecting low-income or minority populations, or both. Chelsea claims that Massport’s method of gauging adverse impacts on low-income and minority populations is flawed because Massport’s conclusions are derived from aggregating data from all affected populations (i.e., all those residing within the 65 or 60 dB [decibel] DNL [day night average sound level] noise contours), so that the adverse impact of Logan operations on Chelsea, which has a higher minority and low-income population than any of the other affected communities, is not viewed by itself, but only as part of the whole. By grouping Chelsea with affected populations which are not predominantly low-income or minority, the effect on Chelseais, in Chelsea’s view, misleadingly minimized. Although this methodology takes into account all populations affected under the no-build and preferred alternatives, Chelsea contends it ignores the fact that implementation of the preferred alternative would increase the number of persons within the 65 dB DNL noise level contour in South Boston (by 32), Chelsea (by 244) and East Boston (by 139), whereas it would reduce the number of persons within the 65 dB DNL noise level contour in two communities with fewer minorities and fewer low-income persons: Winthrop (by 35) and Revere (by 2). (FEIR, pp. 6-151 and 6-153, Tables 6.8-6 and 6.8-7.)
The Secretary directed Massport to compare the population affected by noise impacts related to the Airside Project with the population of Boston as a whole and the other affected municipalities as a whole. (DEIR certificate, p. 14.) Massport did this, and the FEIR reflects that its preferred alternative with Runway 14/32 would decrease the number of people exposed to the highest levels of noise (75 and 70 dB DNL noise contours) in every community, including Chelsea. The FEIR does show that under Massport’s preferred alternative, there are higher percentages of minority and low-income persons within the 65 dB DNL and 60 dB DNL noise contours than the overall percentages of minority and low-income persons in all of the affected communities within those noise contours averaged together. However, these overall percentages are lower than the percentages of minority and low-income persons in Boston or Suffolk County as a whole. Chelsea does not point to any regulation, directive or other source of authority to support the contention that principles of environmental justice require that each affected community be considered individually in relation to all the affected communities or to the political jurisdictions of which the affected communities are a part. The comparison Massport made (as directed by the Secretary) between the affected communities taken together and the jurisdictions of which they form a part appears to conform to the Federal environmental justice policy, and is not arbitrary or capricious. Furthermore, as Massport points out, the estimate of noise impacts imposed by the preferred alternative with the FAA’s required northwest/southeast wind restriction in place suggests that the number of households in Chelsea in the 65 and 60 dB DNL noise contours will decrease as compared to the no-build alternative. (See FEIS, pp. 3-113, 3-117, 3-124 [ex. 47].)
3. Boston’s Counterclaims
For the reasons discussed above (see pp. 17-20), I conclude that count V of Boston’s counterclaims should be dismissed, and count VI should be dismissed without prejudice
*215 ORDER
For the foregoing reasons, it is ordered that the final judgment in this case reflect the following:
1. On Counts I, V, and VI of the counterclaim of the City of Chelsea, judgment is to enter in favor of the plaintiff Massachusetts Port Authority, and dismissing those counts; and
2. On Counts V and VI of the counterclaim of the City of Boston, judgment is to enter in favor of the plaintiff Massachusetts Port Authority, dismissing Count V and dismissing Count VI without prejudice.

 At an earlier stage of this case I allowed Massport’s motion to dismiss a number of Boston’s and Chelsea’s counterclaims. (See Memorandum of Decision and Order on the Massachusetts Port Authority’s Motion to Dismiss Counterclaims, docketed April 30, 2002.) This memorandum of decision deals with the remaining counterclaims raised by Boston and Chelsea.
The defendant intervener Town of Winthrop and the defendant interveners Theresa Cipriano, Charles Wilson, and John Vitagliano and Robert Driscoll Sr. as representatives of the Massachusetts Air Pollution and Noise Abatement Committee (MAPNAC), also filed counterclaims. Winthrop’s counterclaims have been dismissed. (See Memorandum of Decision and Order on the Massachusetts Port Authority’s Motion to Dismiss Counterclaims, docketed April 30, 2002.) The counterclaims of Cipriano, Wilson and MAPNAC were not dismissed, but they have not been pursued, presumably because the issues these counterclaims raise were the subject of the trial on Massport’s complaint in which Cipriano, Wilson and MAPNAC participated.

 Massport’s FEIR was actually a combined FEIR and Supplemental Draft Environmental Impact Statement (SDEIS), prepared for both State review under MEPA and Federal review under the National Environmental Policy Act (NEPA), 49 U.S.C. §4321 et seq. I refer to the FEIR alone since the counterclaims discussed here concern MEPA.

 Again, Massport prepared and submitted a combined draft environmental impact statement/draft environmental impact report (DEIS/DEIR), rather than a separate DEIR. However, references are simply to the DEIR, since Chelsea’s focus is on the MEPA process.

 Massport and Chelsea have also introduced a statement of agreed facts relating to Chelsea’s MEPA claims. (Exhibit [ex.] 1A.)

 Portions of the MEPA record that are relevant to the Chelsea and Boston counterclaims at issue are summarized in this background section. Particular aspects of the record that bear directly on the Chelsea and Boston counterclaims are discussed later in conjunction with those counterclaims. The chronology of the MEPA environmental review process, as well as the separate-but-related environmental review process conducted by the Federal Aviation Administration (FAA) are summarized in the memorandum of decision on Massport’s direct claims. (See Memorandum of Decision and Order for Judgment dated November 18, 2003, pp. 9-14 [17 Mass. L. Rptr. 125].)

 PPP is a program under which an airport proprietor (here Massport) charges a landing fee surcharge unrelated to aircraft weight for aircraft landing during peak hours of 2 p.m. and 8 p.m., as a financial disincentive geared to reduce delays by modifying airline scheduling behavior.

 With respect to the PPP program, the Secretary commented in his certificate that the DEIR analysis appeared to show that PPP produces significant delay reduction benefits, and that, as a result, PPP helps reduce air pollution and noise. On this basis, the Secretary directed Massport to conduct in the FEIR a more refined analysis of the positive and negative environmental impacts of PPP, taking into account specific assumptions and drawing upon its past PPP analysis and experience. The Secretary did not require Massport to analyze other demand management techniques. (DEIR certificate, pp. 11-12 [ex. 31].)

 “Altemative 1A was selected as the Preferred Alternative because it significantly reduces delays without imposing the economic costs on regional carriers and small communities associated with Peak Period Pricing. The Preferred Alternative achieves certain environmental benefits that include improved air qualify and a reduction in noise for the most severely impacted communities, while causing minimal environmental impacts that would be mitigated.” (FEIR, p. 3-2 [ex. 32].)

 “ESPR” stands for Environmental Status ánd Planning Report. This involves a separate MEPA review process from the one governing proposed projects such as the Airside Project. Massport is required in the ESPR to provide a broad assessment of the environmental impacts of Logan Airport operations as a whole. An ESPR must be filed at regular intervals and Massport must file an annual update, called the Environmental Data Report (EDR) in each intervening year. As explained in the FEIR certificate, the 1999 ESPR provides a cumulative analysis of Logan’s operations, environmental impacts, and progress on mitigation efforts, including those relating to air qualify. (FEIR certificate, p. 10.)

 The FEIR certificate describes the Preferential Runway Advisoiy System (PRAS) as “a set of voluntary targets for FAA runway assignments, aimed at ensuring a more equitable regional distribution of aircraft noise among all affected communities, at avoiding the prolonged dwell or persistence of noise over any one community, and at routing flights over water.” (FEIR certificate, pp. 15-16.) According to the certificate, the FEIR demonstrates that use of proposed runway 14/32 would improve compliance with PRAS goals by 61 percent, and that using both PPP and the new runway would improve compliance with PRAS goals by 69 percent. The Secretary requires Massport to update the PRAS program, in light of changes in land use patterns and residential densities. (FEIR certificate, p. 16.)

 TMA refers to Logan Transportation and Management Association.

 Section 61, a principal component of MEPA, provides in relevant part:
All agencies, departments, boards, commissions and authorities of the commonwealth shall review, evaluate, and determine the impact on the natural environment of all works, projects or activities conducted by them and shall use all practicable means and measures to minimize damage to the environment. Any determination made by an agency of the commonwealth shall include a finding describing the environmental impact, if any, of the project and a finding that all feasible measures have been taken to avoid or minimize said impact.
(Emphasis supplied.) Section 61 findings must be made by every agency or authority that is embarking on a project subject to MEPA review. See Enos v. Secretary of Envtl. Affairs, 432 Mass. 132, 137 (2000).

 The other measures listed in the findings relate to relocation of airport tenants, stabilization of vegetation, development of a program for alternative habitat for the upland sandpiper, water resources, soil disposal, mitigation of traffic, air quality and noise impacts during construction, PRAS monitoring, hushkitted aircraft, single engine taxi procedures, and efforts to have those employed at Logan use more public transportation.

 It appears that the EDR is the annual update that Massport is required to file as part of the ESPR process.

 Section 62H provides in relevant part:
Any action or proceeding alleging that a final environmental impact report fails to comply with the provisions of [§§62 to 62G], inclusive, shall commence no later than ... one hundred and twenty days after issuance of notice of availability of said final environmental impact report under [§62C], for a public project. . .

 In relevant part, G.L.c. 214, §7A, provides:
The superior court for the county in which damage to the environment is occurring or is about to occur may, upon a civil action in which equitable or declaratory relief is sought ... by any political subdivision of the commonwealth, determine whether such damage is occurring or is about to occur and may, before the final determination of the action, restrain the person causing or about to cause such damage; provided, however, that the damage caused or about to be caused by such person constitutes a violation of a statute, ordinance, by-law or regulation the major purpose of which is to prevent or minimize damage to the environment.

 There may be some question whether at issue here is this court’s subject matter jurisdiction, which would not be subject to waiver by Massport. Cf. Cummings v. Secretary of Envtl. Affairs, 402 Mass. 611, 613-18 (1988). However, as in the Sierra Club case, the problem, if there is one, seems to be more one of ripeness than fundamental jurisdiction over the subject matter. Sierra Club v. Commissioner of the Dept, of Envtl. Management 439 Mass. 738, 745 (2003). After the Sierra Club decision, there appears to be no valid argument that Chelsea will never have standing to challenge Massport’s §61 findings as they relate to Runway 14/32. If this is so, where Massport does not make any claim about lack of ripeness and all parties have argued the merits of Chelsea’s counterclaims, I will review them.

 As noted above, Count V of Boston’s counterclaims challenges the validity of the Secretary’s decisions, made in response to the NPCs filed by Boston and Chelsea, not to reopen the environmental review process for the Airside Project to consider either (1) The effect of September 11, 2001, on that project or (2) Massport’s alleged lack of commitment to implementing an AQI at Logan. Count VI alleges that Massport will cause damage to the environment within the meaning of G.L.c. 214, §7A, because it intends to proceed with the Airside Project without carrying out its plan to implement the AQI.

 The court made this comment in the context of discussing the position of the town of Walpole in Walpole v. Secretary of the Executive Office of Envtl. Affairs, 405 Mass. 67 (1989), where the project at issue was the construction of permanent sludge (“residuals”) management facilities by the Massachusetts Water Resources Authority, and where Walpole had been selected as a potential site for one or more of the facilities. See Walpole, 405 Mass, at 68-69. The Enos court observed that “[a] decision to locate a project on land owned by the town [of Walpole] would immediately impair the town’s rights. Further, the Secretary’s decision subjected the town to ‘substantial expense[s]’ of hiring consultants to help it participate in required environmental impact studies.” Enos v. Secretary of Envtl. Affairs, supra, 432 Mass, at ¶41.

 As indicated above, there is no jurisdiction under §62H to review the Secretary’s determinations relating to the NPCs. Nor is there jurisdiction under G.L.c. 214, §7A. See Walpole v. Secretary of the Executive Office of Envtl. Affairs, supra, 405 Mass. 70-71.

 The Secretary’s FEIR certificate indicates that he was considering the AQI under the broader ESPR process applicable to Logan as a whole rather than directly as part of his review of the FEIR for the Airside Project (see FEIR certificate, pp. 13-14), and therefore he did not require Massport to include any commitments concerning the AQI in its §61 findings. But this fact does not seem to make a material difference in terms of the availability of review under G.L.c. 214, §7A.

 Moreover, the Secretary has indicated that if there is evidence that Massport is abandoning its commitment to the AQI, this “would constitute a material change in the Airside Project, requiring the submission and review of an NPC.” (Secretary’s response to Chelsea’s NPC, p. 2 [ex. 45].) Boston and other interested parties thus will have an administrative forum to raise their challenge about the claimed abandonment of the AQI.

 Chelsea does not address the issue of impact on low-income or minority populations — environmental justice — in its post-trial brief.

 According to the FEIR, growth in regional airports in Providence, Rhode Island, and Manchester, New Hampshire, have diverted a substantial amount of air traffic from Logan, thereby reducing growth projections for Logan. Thus, while the DEIR projected that Logan would have 37.5 million passengers annually by 2010, the FEIR assumed that Logan would not reach 37.5 million passengers until 2015. In the FEIR Massport attributes this decrease in growth to the expansion of regional airports. (The growth projection has since been modified again to push the expected year for 37.5 million passengers to 2018, but this new estimate is not tied to the performance of regional airports.)

 The trial record in Massport’s injunction case reveals that as of early 2003, Massport’s efforts to market and develop Worcester Airport as a successful regional airport for commercial flights had essentially failed. But the evidence did not suggest that the lack of success with Worcester was due to any lack of effort on Massport’s part, and in any event, this later evidence cannot be used to challenge the adequacy of Massport’s FEIR, or the FEIR certificate, both of which are dated in the first half of 2001.

 The MEPA documents show that in 1999, 2000, and early 2001, Massport added some commercial service at Hanscom Field, but that some were discontinued. Although the record does not specifically indicate the reason(s) for the discontinued flights and service, the fact that the commercial flights did not continue provides some support for the view that Hanscom is not necessarily a successful commercial flight alternative to Logan.

 Since Massport determined Hanscom Field was not a feasible alternative, the MEPA regulations do not require it to describe the environmental consequences of using Hanscom. See 301 Code Mass. Regs. §11:07(6)(f)(4). Nonetheless, in response to the Secretary’s request, Massport did provide a summary of existing analysis of the baseline and projected environmental impacts of a hypothetical 3 percent increase in commercial regional commuter service at Hanscom Field. (FEIR, vol. 3, Appendix B, pp. 1, 2 and 7.)

 As noted, I am not clear whether Chelsea intends to waive any MEPA-based argument relating to environmental justice, but in the interests of completeness, I briefly discuss the arguments here.